IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


ODRAYE G. JONES,                              )     CASE NO.  1:03CV1192
                                             )
              Petitioner,                     )
                                             )
       v.                                     )
                                             )
MARGARET BRADSHAW, WARDEN,                    )     MEMORANDUM   OPINION
                                             )
              Respondent.                     )


KATZ, J.

       This matter is before the Court on Petitioner, Odraye Jones's ("Jones") Petition for a writ

of habeas corpus, (Doc. No. 17), and Amended Petition, (Doc. No. 99).  Respondent, Margaret

Bradshaw, filed a Return of Writ, (Doc. No. 18), and Amended Return of Writ, (Doc. No. 103).

Jones thereafter filed a Final Amended Traverse, (Doc. No. 114).  The Respondent filed several

responsive briefs,  (Doc. Nos. 61, 63, 115).  For the following reasons, Petitioner's motion for a

writ of habeas corpus will be denied.

## I. Factual Background

       On November 26, 1997, Jones was indicted by an Ashtabula County grand jury on one

count of the aggravated murder of Police Officer William D. Glover with prior calculation and

design in violation of Ohio Revised Code § 2903.01(A).  That count contained the following four

specifications: (1) that the offense was committed for the purpose of escaping detection, trial or

punishment for another offense committed by the defendant in violation of Ohio Revised Code §

2929.041(A)(3); (2) the victim of the offense was a peace office whom the defendant had reasonable cause to know or knew such and that at the time of the offense, Officer Glover was engaged in his duties as a peace officer, in violation of Ohio Revised Code § 2929.04(A)(6); (3) that is was the defendant's specific purpose to kill a peace officer at the time of the offense in violation of Ohio Revised Code § 2929.04(A)(6); and (4) that the defendant had a firearm on or about his person or under his control while committing the offense and displayed the firearm, . . . or used it to facilitate the offense in violation of Ohio Revised Code § 2941.145.

Finding that Jones was indigent, the trial court appointed David L. Doughten as lead counsel and Robert L. Tobik as co-counsel to represent him during trial.  After voir dire was complete and the jury sworn in, attorney David Per Due filed a notice of appearance on Jones's behalf and asked for a four month continuance to prepare Jones's defense.  The trial court offered Per Due the opportunity to work with appointed counsel, but Per Due refused.  The trial court then concluded that Per Due's notice of appearance was filed for purposes of delay and barred him from representing Jones during trial.

Jones's trial by jury commenced on May 5, 1998.  The jury found Jones guilty on the capital murder count and all four specifications.  The mitigation hearing commenced on June 2, 1998.  The jury found that the aggravating circumstances outweighed the mitigating factors and recommended that Jones be sentenced to death.  On June 11, 1998, the trial court accepted the jury's recommendation and imposed a death sentence for the aggravated murder.  It also sentenced Jones to a mandatory three-year term of incarceration for the firearm specification to run consecutively to the death sentence.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence

presented at trial, upon considering Jones's direct appeal of his convictions and sentence:

On November 17, 1997, a dispatcher for the Ashtabula City Police Department advised officers that appellant Odraye G. Jones, an individual with outstanding felony warrants, had been spotted in the 900 block of West 43rd Street in Ashtabula. A week earlier, appellant had told his cousin, Jimmie Lee Ruth, that he was facing a lot of time for robbing Isaac Coleman and that he "was going to shoot at the police if they ever tried to arrest him."

Officer William D. Glover, Jr., responded to the dispatcher's call. Officer Glover found appellant with a friend, Anthony Gene Barksdale, and Jimmie Lee Ruth walking together on West 43rd Street. Officer Glover followed the three men to the home of one of their friends, Flo Chapman. Barksdale knocked on the door of the Chapman home while Ruth and appellant stood behind him on the porch. Officer Glover approached the Chapman home, got out of his car, and beckoned to appellant. Ruth testified that Officer Glover told appellant, "[C]ome on, you know why I'm here. I don't want no problem. I'm just doing my job." Appellant jumped off the side of the porch and began running down the side of the Chapman home. Officer Glover pursued him. Not long after the pursuit commenced, appellant turned around, pulled a .38 caliber revolver from his pocket, and began firing shots at Officer Glover.

After firing the first shot, appellant began to approach Officer Glover, firing several more shots. Officer Glover fell to the ground. Appellant turned and fled. He ran to a nearby fence and began to climb through a hole in it. Appellant then stopped, turned around, and ran back to where Officer Glover lay. Appellant kicked Officer Glover in the chest. The kick was done with such force that it left a large bruise on Officer Glover's chest that was visible to the paramedics who later treated Officer Glover at the scene. After kicking Officer Glover, appellant fled the scene.

As Officer Glover was pursuing appellant, another Ashtabula City Police Officer, Robert Stell, was en route in his patrol car. Officer Stell located appellant several blocks away from the scene of the shooting, still running. Officer Stell got out of his car and ordered appellant to stop. Appellant ignored the command and continued running. Officer Stell pursued appellant on foot. Appellant led Officer Stell into a nearby apartment complex. He stopped at the door of an apartment and began attempting to force his way inside. While appellant managed to squeeze part of his body through the door, the occupant of the apartment prevented appellant from fully entering. As appellant was struggling to enter the apartment, Officer Stell began to approach appellant. Officer Stell drew his weapon and ordered appellant to the ground. Appellant did not immediately respond. Appellant threw his revolver behind him. The gun landed in some nearby shrubbery. Officer Stell again ordered appellant to the ground and, this time, appellant complied. Officer Stell held appellant at gunpoint until assistance arrived. Officers recovered the

-3-

weapon and appellant was placed under arrest. This gun was later matched to fired cartridge casings recovered at the scene of the shooting, live cartridges found on appellant at the time of his arrest, and bullets taken from Officer Glover's body. All of the ammunition was hollow point. This type of ammunition is designed to open up on impact, causing larger wounds.

Officer Glover had sustained gunshot wounds to the top of his head and to the area just below his right eye. He also sustained a bullet wound to his right shoulder. The gunshot wound to the top of Officer Glover's head and the wound to his face were both fired from a distance of less than one foot. The suddenness of appellant's attack had apparently caught Officer Glover by surprise. Officer Glover's duty weapon was found in Officer Glover's holster. The holster's strap was snapped securely shut.

Paramedics transported Officer Glover to Ashtabula County Medical Center for emergency treatment. After Officer Glover's condition had been stabilized, he was life-flighted to Cleveland's Metro-Health Hospital. X-rays and CT scans revealed substantial damage to Officer Glover's brain. Officer Glover had severe cerebral swelling and profuse bleeding from his nose and mouth. Neurological assessments revealed minimal brain stem function. Officer Glover died from his gunshot wounds the following morning, November 18, 1997.

*State v. Jones*, 744 N.E.2d 1163 (Ohio 2001).

## II. Procedural History

Represented by Stephen A. Ferrell of the Ohio Public Defender's Office and Robert A. Dixon, Jones filed a timely direct appeal of the trial court judgment to the Ohio Supreme Court on July 24, 1998, raising fifteen propositions of law.  The Ohio Supreme Court affirmed the conviction and sentence on April 18, 2001.  *State v. Jones*, 744 N.E.2d 1163 (Ohio 2001).  Jones concluded his direct appeal by petitioning the United States Supreme Court for certiorari.  The Supreme Court denied the petition.  *Jones v. Ohio*, 534 U.S. 1004 (2001).

On November 5, 1999, Jones filed a petition for post-conviction relief pursuant to Ohio Revised Code § 2953.21 in the Ashtabula County Court of Common Pleas, alleging twenty-six (26) claims for relief.  The court found that Jones could not substantiate his claims for post-

conviction relief and dismissed the petition. Jones appealed the dismissal on November 20, 2000, to the Eleventh District Court of Appeals, raising three assignments of error. Finding that the appeal was without merit, the court dismissed it. *State v. Jones*, No. 2000-A-0083, slip op., 2002 WL 737074 (Ohio Ct. App. Apr. 26, 2002). Jones appealed the Eleventh District's decision, filing a memorandum in support of jurisdiction in the Ohio Supreme Court on June 12, 2002. He asserted three propositions of law. The Ohio Supreme Court declined to hear the case and dismissed the petition on September 11, 2002. *State v. Jones*, 774 N.E.2d 767 (Ohio 2002)(Table).

Jones also filed an application to reopen his direct appeal with the Ohio Supreme Court, raising four propositions of law.[1] On September 26, 2001, the Ohio Supreme Court denied the application. *State v. Jones*, 755 N.E.2d 356 (Ohio 2001)(Table). Jones filed a second application to reopen his direct appeal but the Ohio Supreme Court denied that appeal as untimely and not allowed under the Rule. *State v. Jones*, 841 N.E.2d 315 (Ohio 2006)(Table).

---

[1]

An application to reopen, also known as a *Murnahan* application, permits a convicted criminal defendant to assert that he received ineffective assistance of counsel during his or her first appeal as of right. The Ohio Supreme Court invited the state legislature to promulgate rules to establish this proceeding in *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). Thereafter, the Ohio legislature created Rule of Appellate Procedure 26(B), which reads in pertinent part:

> (1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

Ohio R. App. P. 26(B). For cases in which there is an appeal directly to the Ohio Supreme Court, an appellant may file a similar application pursuant to Ohio Supreme Court Practice Rule XI, Section 6.

### III. Habeas Proceeding

On June 13, 2003, Jones filed a Notice of Intent to file a habeas corpus petition pursuant to 28 U.S.C. § 2254, (Doc. No. 1).  Concurrently, Jones filed a Motion for a Stay of Execution, which the Court granted, (Doc. No. 6).  Jones did not file a motion for appointment of counsel, as he retained counsel to represent him.   On August 7, 2003, the Court issued a Case Management Order, requiring that the petition be filed by September 11, 2003.  (Doc. No. 11).  Jones filed a Motion for Reconsideration of the Court's Case Management Order on August 13, 2003.  (Doc. No. 12).  Therein, Jones asserted that his motion for relief from judgment, pursuant to Ohio Rule of Civil Procedure 60(b), was pending in the Ohio courts until April 23, 2003.  Thus, Jones maintained, the federal habeas statute of limitations was tolled, pursuant to 28 U.S.C. § 2244(d)(2),[2] while the Ohio courts adjudicated the Rule 60(b) motion.  The Court held that it could not determine whether Jones's Rule 60(b) motion tolled the statute of limitations and denied Jones's Motion.  (Doc. No. 13).  Thereafter, Jones filed a Motion for an extension of time to file the Petition, (Doc. No. 14), which the Court granted.  (Doc. No. 16).  Jones filed a Petition on October 10, 2003. (Doc. No. 17).  Respondent filed the Return of Writ on December 8, 2003. (Doc. No. 18).  After requesting and receiving four extensions, Jones filed a Traverse on May 3, 2004.  (Doc. No. 59), and a Supplement to the Traverse on May 7, 2004.  (Doc. No. 60).  The Respondent filed responsive pleadings to both these documents.  (Doc. Nos. 61, 63).

Jones thereafter filed a motion to expand the record, amend the petition, and to appear as

---

[2]
That statute states: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

-6-

co-counsel with his retained counsel, Paul Mancino.  (Doc. No. 62).  He subsequently filed a motion for an evidentiary hearing and a second motion to expand the record.  The Court denied without prejudice all the motions except the motion to appear as co-counsel.  (Doc. No. 72). Finding that Jones was either entitled to proceed pro se or with attorney representation, but could not proceed with "hybrid representation," the Court ordered Jones to chose whether he wished to have Mancino continue to represent him, whether he wished the Court to appoint him new counsel, or whether he wished to proceed pro se.  *Id.* at 3.  On August 27, 2004, Jones notified the Court that he wished to have counsel appointed to represent him.  (Doc. No. 73).  The Court granted Jones's request, removing Mancino as counsel and appointing Jeffrey Helmick and Spiros Cocoves to represent Jones.  (Doc. No. 77).

After requesting and receiving permission for an extension of time to file a motion to amend the petition and other pre-petition motions, Jones filed a motion to stay this proceeding pending his return to state court to exhaust his ineffective assistance of appellate counsel claim. (Doc. No. 89).  On October 14, 2005, the Court granted the motion.  (Doc. No. 93).  On March 30, 2006, the Respondent notified the Court that the Ohio Supreme Court had ruled on Jones's application, concluding the state court litigation.

Jones filed an Amended Petition on May 3, 2006.  (Doc. No. 99).  The Respondent filed an Amended Return of Writ shortly thereafter.  (Doc. No. 103).  After asking for several extensions of time, Jones filed a Final Amended Traverse on November 30, 2006.[3]  (Doc. No. 114).   The Respondent filed a Sur-Reply on December 14, 2006, (Doc. No. 115), rendering this matter ripe

---

[3]

      Jones's Final Amended Traverse consolidates the initial Traverse and Supplement to the Traverse.  (Doc. No. 114).  Accordingly, the Court will utilize only the Final Amended Traverse when reviewing Jones's grounds for relief.

for disposition.[4]

## IV. Statute of Limitations Issue

Prior to reviewing the merits of Jones's petition, the Court must first decide whether it is timely pursuant to the statute of limitations set forth in 28 U.S.C. § 2244(d). That statute states in pertinent part:

> **(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court . The limitation period shall run from the latest of –
>
> > **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> > **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> > **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> > **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1)(A)-(D). As stated above, the statutes further provide that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of

---

[4] Jones also attempted to file a *pro se* Traverse on February 16, 2007. The Court refused to accept the *pro se* brief, however, because Jones is represented by counsel. Through counsel, Jones filed the *pro se* Traverse with attachments on May 14, 2007. (Doc. No. 116). This document focuses primarily on evidence pertaining to Jones's actual innocence claim. Most of the attachments to the *pro se* Traverse are either contained in the habeas record or could have been so contained as they were prepared during Jones's trial and state court appeals.

limitation under this subsection."  28 U.S.C. §2244(d)(2).

Both parties agree that Jones's direct appeal concluded on October 29, 2001, when the United States Supreme Court denied Jones's petition for certiorari to that Court.  Moreover, neither party alleges that the limitations period should commence later than that date because one of the circumstances depicted in (d)(1)(A)-(D) has occurred in Jones's case.  Finally, both parties agree that Jones's petition for post-conviction relief and motion for relief from judgment pursuant to Ohio Rule of Civil Procedure 60(b) were pending in the state courts at the time his direct appeal concluded.

The point of contention arises when determining at what point Jones's "properly filed application for State post-conviction or other collateral relief" concluded in state court and the limitations period began running.  Jones alleges that the limitations period began to run on April 23, 2003, when the Ohio Supreme Court rejected Jones's Rule 60(b) motion.  Thus, he maintains, the limitations period did not conclude until April 23, 2004.  Because he filed his petition on October 10, 2003, Jones contends that his Petition is timely.

The Respondent asserts that Jones's petition is untimely on two grounds.  First, the Respondent asserts that this Court should not consider Jones's Rule 60(b) motion to be "properly filed" pursuant to § 2244(d)(2).  She claims that because Jones raised issues in that motion that should have been raised in his post-conviction relief petition, and because the Ohio courts concluded that the claims Jones raised in the motion were either barred by the doctrine of res judicata or failed to allege new evidence not in existence at the time of the trial, this Court should find that Jones's Rule 60(b) motion did not toll the limitations period.

Although the United States Supreme Court has not specifically defined what constitutes a

"properly filed" state post-conviction application, in *Artuz v. Bennett*, 531 U.S. 4 (2000), the Court provided some guidance as to its meaning.  In that case the Court held that an application for state post-conviction relief containing claims that are procedurally barred under state law is "properly filed" within the meaning of the statute.  *Id.* at 11.  In so holding the Court distinguished between an application that is filed from an application that is *properly* filed.  It opined that while an application is considered filed when it is delivered to and accepted by the court, it is not properly filed unless "its delivery and acceptance are in compliance with the applicable laws and rules governing filings."  *Id.* at 8.  It elaborated that these laws and rules "usually prescribe, for example, the form of the document, the time limits of its delivery, the court and office in which it must be lodged, and the requisite filing fee."  *Id.*

Here, neither party alleges that Jones filed his Rule 60(b) motion outside the time limits set forth pursuant to that Rule.  The fact that the state court said the 60(b) motion had no merit, or that its claims should have been raised in a post-conviction petition does not bear on its timeliness pursuant to the *Artuz* Court's definition of that term.  Thus, under *Artuz*, Jones's Rule 60(b) motion would be a "properly filed" application for collateral relief that was pending in state court and would therefore toll the § 2244(d)(1) limitations period.

The Respondent also alleges that Jones's Rule 60(b) motion does not toll the limitations period under the Sixth Circuit's holding in *Austin v. Mitchell*, 200 F.3d 391 (6th Cir. 2000).  In that case, the Sixth Circuit held that an application for collateral relief in state court would not toll the statute of limitations under § 2244(d)(2) unless it alleged federal constitutional violations that were later the subject of a habeas petition in federal court.  Thus, the Respondent maintains, and this Court held in its prior order denying Jones's request to reconsider its Case Management

-10-

Order, that Jones failed to comply with the *Austin* holding.

Since the time Respondent filed the Return of Writ (and since this Court issued its Order), the Sixth Circuit issued its opinion in *Cowherd v. Million*, 380 F.3d 909 (6th Cir. 2004), which overruled *Austin*. In *Cowherd*, the Sixth Circuit noted that several other Circuit Courts had criticized the *Austin* opinion as failing to give meaning to the phrase "pertinent judgment" in § 2244(d)(2). Thus, because the *Austin* court did not consider that "judgments" of a state court could also toll the limitations period, the *Cowherd* court held that the *Austin* decision must be overruled. Accordingly, a federal habeas petitioner need not present federal claims that he or she subsequently raises in a federal habeas petition to the state courts in order to toll the statute of limitations. Contrary to the Respondent's assertions, the content of Jones's Rule 60(b) Motion in state court is rendered irrelevant under the *Cowherd* holding. The Court finds that the Rule 60(b) Motion tolled the commencement of the limitations period until April 23, 2003. The limitations period expired one year later, on April 23, 2004. Thus, Jones's filing of his Petition on October 10, 2003, was timely.[5]

## V. Petitioner's Grounds for Relief

In his Petition and Amended Petition, Jones raises the following thirty-four (34) grounds for relief:

---

[5] The Respondent asserts in her Reply to the Final Amended Traverse that the United States Supreme Court's decision in *Lawrence v. Florida*, – U.S. –, 127 S.Ct. 1079 (2007), although not yet issued at the time the Respondent filed the Reply, would be significant to this Court's determination regarding whether Jones's petition is timely under § 2244(d). The Supreme Court held in that case that the one-year limitations period is not tolled during the time in which an applicant petitions for certiorari of the denial of state post-conviction relief. *Id.* at 1086. Because the Court finds here that Jones's Rule 60(b) motion tolled the statute of limitations period until April 23, 2004, the *Lawrence* decision is inapposite.

1.     Petitioner was denied his constitutional right to [a] reliable death sentence under the Constitution and his right to a fair and impartial jury.  Petitioner was prohibited during the jury empaneling and unduly restricted about asking questions of prospective jurors concerning their ability to consider mitigating factors.

2.     Petitioner was denied a fair and impartial jury when prospective jurors who had been previously convicted of criminal offenses were automatically excluded from participation even though the jurors had their civil rights restored which included their right to vote.

3.     Petitioner was unconstitutionally sentenced to death when mitigating factors presented at trial were not outweighed by any aggravating circumstances proven by the prosecution.

4.     Petitioner was denied his constitutional right where he was sentenced to death where the trial judge instructed the jury in such a manner that the jury could not consider a penalty less than death until they had unanimously found that the prosecution had failed to prove aggravating circumstances beyond a reasonable doubt.

5.     Petitioner, who was charged with a capital offense, was denied his constitutional rights where during voir dire petitioner was denied a fair and impartial jury.  Jurors were seated who were all death qualified.

6.     Petitioner was denied a fair and impartial jury when the court refused the motion for a change of venue based upon a racial imbalance of jurors since petitioner, an African-American, was tried by an all-white jury.

7.     Petitioner was denied his constitutional right to have counsel of choice when the court would not permit petitioner to have his own counsel of choice participate in his trial.

8.     Petitioner was denied a fair trial where because of cumulative errors committed during the course of his trial he was denied a fair trial.

9.     Petitioner was denied his constitutional rights because the state failed to present evidence of a deliberate plan to kill in order to sustain a conviction for a killing with prior calculation and design and failed to present proof beyond a reasonable doubt as [to] all of the essential elements of the offense and attendant specifications.

10.    Petitioner was denied a fair trial where there were multiple errors committed during the trial phase of the trial and various instructions given by the court.

11.    Petitioner was denied his constitutional rights where it was claimed that petitioner caused the death of a police officer to prevent petitioner's arrest for another offense which were all aggravating circumstances which were duplicative and arose from the same conduct.

12.    Petitioner was denied a fair trial by reason of misconduct by the prosecutor.

-12-

13.     Petitioner was denied his constitutional rights where the jury was instructed in such a manner that allowed the jury to decide what evidence was admissible concerning the aggravating circumstances and where the jury instructions did not conform to federal constitutional law.

14.     Petitioner was denied effective assistance of counsel where, through errors and omissions, counsel's representation fell below an objective standard of representation. Petitioner was prejudiced by reason of these errors and omissions.

15.     Petitioner was unconstitutionally sentenced to death where the trial court failed to accord the proper weight to mitigating evidence claiming it did not qualify as mitigating evidence and the court used an aggravating circumstance to outweigh the mitigating evidence.

16.     Petitioner was convicted under a death penalty statute which did not meet minimum constitutional requirements and which was otherwise unconstitutional on its face or as applied to petitioner.

17.     Petitioner was denied his constitutional right to effective assistance of counsel where petitioner presented evidence after his trial in a post-conviction petition demonstrating that petitioner's trial counsel had rendered ineffective assistance.

18.     Petitioner was denied effective assistance of counsel where counsel failed to investigate the case and present mitigating evidence which would have prevented petitioner from being receiving [sic] a death sentence.

19.     Petitioner was denied his constitutional rights where exculpatory evidence was withheld from trial counsel by the prosecution.

20.     Petitioner was denied fundamental fairness and substantive due process where his conviction was based on perjured testimony of Anthony Barksdale. The state withheld impeachment evidence. Moreover, trial counsel was ineffective because trial counsel did not use available information needed to impeach Barksdale.

21.     Petitioner did not receive effective assistance of counsel when petitioner was denied his right to counsel where there was animosity between court-appointed counsel which prevented a client-attorney working relationship.

22.     Petitioner was denied a fair and impartial jury when counsel failed to probe potential jurors about the issue of race and prejudice where the victim was white and petitioner was an African-American youth.

23.     Petitioner was denied a fair trial where the state withheld exculpatory evidence regarding discovery of the alleged murder weapon.

24.     Petitioner was improperly sentenced to death because he did not receive effective assistance of counsel during his mitigation hearing.  Defense counsel did not properly prepare expert witnesses or present proper mitigation evidence.

25.     Petitioner, who had a distrust of his own court-appointed attorneys, was unable to assist in his defense.  Moreover, objective evidence manifestations were presented that petitioner did not understand the nature and object of the proceedings.  Thus, petitioner's competency should have been the subject of inquiry prior to trial.

26.     Petitioner was denied a fair trial when the trial was had in the county where the death occurred.  Petitioner's trial should have been moved to a neutral setting as petitioner could not obtain a fair trial in Ashtabula County because the jury pool was saturated with prejudicial pretrial publicity.

27.     Petitioner was denied a fair and impartial jury where the court allowed alternate jurors into the jury room deliberations during the guilt phase of the trial.

28.     Petitioner was denied due process of law and equal protection of the law where Ohio's post-conviction procedures failed to afford one convicted of a criminal offense, such as petitioner, an adequate corrective process to indicate [sic] constitutional violations.

29.     Petitioner was denied effective assistance of counsel where petitioner produced evidence that defense counsel failed to fully investigate and cross-examine a key state's witness with readily impeachment material.  Moreover, counsel failed to fully investigate and impeach the credibility of Anthony Barksdale.

30.     Petitioner was convicted of aggravated murder which requires prior calculation and design. However there was insufficient evidence to prove prior calculation and design and thus petitioner's conviction and sentence offends due process of law.

31.     During the state court proceedings, the trial court . . . closed the courtroom to the public without objection by the defense.  The lack of an objection by the defense is contrary to acceptable levels of constitutionally effective representation and also contrary to established United States Supreme Court precedent.

32.     Prior to and during the course of Mr. Jones's capital trial, a number of in-chambers hearings took place, as well as pre-trial hearings where defense counsel were present but not Mr. Jones.

33.     During Mr. Jones's trial, the State introduced, through argument and witness testimony, numerous instances of prejudicial victim impact testimony and prosecutorial misconduct by way of improper argument.  Most, if not all, of this victim impact testimony and improper argument was introduced to the jury without objection by trial counsel.

34.     During both phases of Mr. Jones's trial, the prosecutor engaged in numerous and blatant instances of prosecutorial misconduct.

## VI. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Jones's initial Petition was filed on October 10, 2004, the AEDPA governs this Court's consideration of his Petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (citing *Williams v. Taylor*, 529 U.S. 362, 436 (2000)).  In advancing such goals, Section 2254(d) places new constraints on "the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  *Williams*, 529 U.S. at 412.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

-15-

28 U.S.C. § 2254(d).

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).[6] The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately. *Williams,* 529 U.S. at 412-13; *Hill*, 337 F.3d at 711. A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the Petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413. A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711. For a state court's application of clearly established federal law to be unreasonable, the state court's decision must be more than incorrect or erroneous; rather, it must

---

[6]

      Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

-16-

be objectively unreasonable.  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Williams*, 529 U.S. at 411; *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the Court noted a "clear factual error" such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant constitutes an "unreasonable determination of the facts in light of the evidence presented."  *Id.* at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mason v. Mitchell*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary").  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact.

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375

-17-

F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).[7]  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a de novo review of the claim.  *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).[8]  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law."  *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)(citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

## VII. Exhaustion and Procedural Default

### A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal

---

[7]

Prior to *Maples*, the Sixth Circuit had applied the AEDPA standard of review to claims which had not been explicitly mentioned or analyzed by the state courts.  *See, e.g., Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003); *Doan v. Brigano*, 237 F.3d 722, 727 (6th Cir. 2001).  However, in *Maples*, the Sixth Circuit found that *Doan* and *Clifford* had been abrogated by the United States Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003).  *Maples*, 340 F.3d at 437.

[8]

To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Maples v. Stegall*, 340 F.3d 433, 437-38 (6th Cir. 2003).

-18-

habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982).

Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity

to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas

petitioner satisfies the exhaustion requirement when the highest court in the state in which the

petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Rust v.*

*Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).

If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not

occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust*, 17 F.3d at

160.[9]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has

completely exhausted his available state court remedies to the state's highest court."  *Buell v.*

*Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001)(quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th

Cir. 2001))(internal quotation marks omitted).  Rather than dismiss certain claims the Court deems

unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to

state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances

where the petitioner has failed to present a claim in state court, a habeas court may deem that

claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.

*Buell*, 274 F.3d at 349.   To obtain a merit review of the claim, the petitioner must demonstrate

cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of

justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v.*

---

[9]
      The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of
res judicata an Ohio court from considering any issue that could have been, but was
not, raised on direct appeal.

*Walker*, 224 F.3d 542, 550 (6th Cir. 2000)(citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

## B. Procedural Default

### 1. General Law

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a

> state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing *Coleman*, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply

-20-

with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim.  Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001)(citing *Maupin*, 785 F.2d at 138)(further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, that "a later decision rejecting the claim did not silently disregard the bar and consider the merits."  *Ylst*, 501 U.S. at 803.  "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review."  *Id.* at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or; (2) a fundamental miscarriage of justice would result from a bar on federal review.  *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's

procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim or interference by officials that made compliance impracticable.  *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  *Murray*, 477 U.S. at 488-489; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp. 2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392

(2004)(citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985)). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

### 2. Jones's Challenges to the Application of Procedural Default

#### a. Post-conviction relief claims

Jones asserts in his Final Amended Traverse that claims raised in post-conviction relief proceedings that were based on evidence outside the record or unavailable to him at the time of the direct appeal should not be barred from this Court's review on grounds of res judicata.[10] The Court declines to express a general conclusion regarding this issue and will address this argument as it is raised in regard to Jones's individual grounds for relief.

#### b. Actual Innocence

It is unclear from the Final Amended Traverse whether Jones is asserting an actual

---

[10] During post-conviction proceedings, Ohio courts can hold that a claim is barred by res judicata based on the holding in *State v. Perry*, 226 N.E.2d 104 (Ohio 1967). In that case, the Ohio Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id.* at 108; *see also State v. Roberts*, 437 N.E.2d 598, 601 (Ohio 1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* (outside of) the record, it must be raised during direct appeal, or be deemed waived.

-23-

innocence claim to excuse any procedural default – a so-called "gateway" actual innocence claim – a free-standing actual innocence claim, or both.  The Court will review Jones's actual innocence claim pursuant to the standard as set forth in *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995), the "gateway" actual innocence claim, because that standard is easier to meet.  *See Herrera v. Collins*, 506 U.S. 390, 442 (1993)(holding that to prevail on a free-standing actual innocence claim "the petitioner must show that he probably is innocent.")(Blackmun, J., dissenting).  The Court finds that Jones cannot meet the *Schlup* standard and therefore cannot use his actual innocence as either a means to excuse procedurally defaulted claims or as a free-standing claim to obtain habeas relief.  The Court sets forth its reasoning below.

In *Schlup*, the United States Supreme Court determined that the petitioner in that case should have been afforded a merit review of his claims after evidence suggested that he had been the victim of mistaken identity in the murder of a prison inmate.  The *Schlup* Court held that, where a petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of the crime, rather than merely objecting to the death sentence, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Id.* at 327 (quoting *Murray v. Carrier*, 477 U.S. at 496).  To constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Id.*  The *Schlup* Court described the specific analysis the district court must employ when faced with a petitioner's allegation of actual innocence:

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold

> requirement unless he [or she] persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him [or her] guilty beyond a reasonable doubt.

*Id.* at 329.

Recently, the United States Supreme Court affirmed that the *Schlup* holding remains the standard by which actual innocence claims are reviewed.  In *House v. Bell*, 547 U.S. – , 126 S.Ct. 2064 (2006), the Court held that a death row inmate had met the *Schlup* standard by introducing new evidence sufficient to permit him to obtain a merit review of his procedurally defaulted claims.  Before reaching its conclusion, the *House* Court meticulously detailed the new evidence that the jury had been deprived the opportunity to examine, finding it to be substantial enough to meet the *Schlup* standard. *Id.* at 2078-87.

In the instant case, Jones does not specify what "new evidence" he offers to persuade the Court that he is actually innocent and/or actually innocent of the death penalty.  While he reviews in detail the trial testimony of Theresa Taylor and her description of the coat the shooter wore, this testimony was the subject of a thorough cross-examination by defense counsel during trial.  Thus, unlike the petitioners in *Schlup* and *House*, Jones does not proffer new evidence that, along with the trial evidence, would support his claim of innocence.  Accordingly, the Court finds that the miscarriage of justice exception to the procedural default bar is unavailable to Jones.

### VIII. Individual Grounds for Relief

### A. First, Second, and Fifth Grounds for Relief - Voir Dire Issues

### 1. First Ground for Relief

Jones asserts in his first ground for relief that the trial court erred when it refused to allow defense counsel the opportunity to question venire members about their views of specific

mitigating factors.  He claims that the court's ruling on this issue led to prospective jurors' confusion about the definition of mitigating factors, which resulted in the selection of a jury that was pre-disposed to imposing a death sentence.  The Respondent acknowledges that this claim is not procedurally defaulted.  The Court can therefore review it on the merits.

Prior to trial, Jones moved the court to permit defense counsel to question the venire about whether they were able to consider specific mitigating factors.  Defense counsel indicated that they wished to ask each prospective juror during the individual sequestered voir dire whether he or she could give effect to the (B)(7) mitigating factor, under which defense counsel wanted to introduce evidence of Jones's dysfunctional upbringing, as well as the (B)(4) mitigating factor, which would support Jones's youth at the age of the offense.  (Doc. No. 30, at 90; 92).  In its ruling on the motion, the trial court found such questioning inappropriate.  It opined:

> In the case of *State v. Lundgren*, 73 OS 3d 474 at 48, the Ohio Supreme Court clearly held that hypothetical questions regarding specific mitigating factors should not be permitted by the Court during voir dire.  The inquiry to be made is whether a juror will properly weigh and consider the mitigating factors, or whether they will automatically impose the death sentence without consideration of the mitigating factors.
> This Court believes that the inquiry made of prospective Jurors must be a general inquiry as to whether or not they would automatically vote for the death penalty, and whether or not they will consider mitigating factors as later instructed by the Court.  To permit questioning on specific mitigating factors is not proper because certain mitigating factors my not be presented in evidence and, at this stage, it is wholly speculative as to what mitigating factors may be presented to the Jury.  In addition, it is a Jury function to weigh the mitigating factors and to place such weight upon the established mitigating factors as they deem proper.  To question a juror during voir dire to determine whether or not they would give weight to any specific mitigating factor evades [sic] the province of the Jury, since the Jury may determine to give specific mitigating factors, no weight at all.

(Doc. No. 23, at 518-19).

On direct appeal to the Ohio Supreme Court, Jones raised this issue, contending that the

-26-

trial court erred in its decision.  The court rejected Jones's assertion, holding that:

> During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors.  *See State v. Wilson* (1996), 74 Ohio St.3d 381 385-6; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481. Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law.  *Id.*

*State v. Jones*, 744 N.E.2d 1163, 1171 (Ohio 2001)(parallel citations omitted).

The Court must now decide whether the Ohio Supreme Court's decision was an unreasonable application of United States Supreme Court precedent.  While the Supreme Court has yet to adjudicate this precise issue, Jones cites to several cases in his briefs in which the Court opined about capital jury selection.  In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Court reviewed a so-called "reverse *Witherspoon*"[11]  case in which the Court determined that a trial court must excuse for cause any juror who would automatically impose the death penalty.  The *Morgan* Court concluded that "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty."  *Id.* at 738.   Thus, the Court instructed trial courts that, regardless of a juror's personal beliefs, the juror must be able to follow the law to ensure a

---

[11]

> In *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968), the Supreme Court invalidated a capital sentence when the trial court excused all jurors who expressed a conscientious objection to the death penalty.  The Court reasoned that the proper inquiry was not whether a prospective juror opposed the death penalty generally, but whether the juror's religious, moral or philosophical beliefs would prevent him or her from following the court's instructions.  *Id.* at 514 n.7 ("[E]ven a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the laws of the State.").

defendant's right to a fair trial.

The United States Supreme Court has also held that a federal habeas court's ability to review voir dire proceedings in state court is limited to "enforcing the commands of the United States Constitution." *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991).  In that case, the Court determined that while a trial court must question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed. *Id.* at 431.   In upholding the trial court's questioning of the venire, the Court reiterated that "[a] trial court's findings of juror impartiality may be overturned only for 'manifest error.'" *Id.* at 428 (citations omitted).

It is clear in the instant case that the Ohio Supreme Court was not unreasonable in finding no such error occurred prior to Jones's trial.  The trial court meticulously questioned the venire members regarding their ability to follow the instructions it would give to them in the event the trial reached a penalty phase.  Moreover, it secured from each prospective juror a commitment to follow the law, putting aside any personal beliefs each may have held.  By exacting each juror's promise to follow the law, the trial court met the requirements imposed on it under *Morgan*.  Thus, the Ohio Supreme Court's opinion upholding the trial court's decision was not an unreasonable one.

Moreover, Jones's assertions that a certain venire member, Mary Risley, who had "very strong inclinations toward the death penalty," was permitted to sit on the jury because of the trial court's failure to provide an adequate definition of mitigation is not supported by the trial record.  While it does appear, as Jones asserts, that Ms. Risley appeared to be confused by the term mitigation, believing that it pertained to circumstances that would limit a defendant's criminal

-28-

liability, she ultimately stated that she could follow the law as provided through the trial court's instructions.  The trial court's explanation and Ms. Risley's reply are as follows:

> THE COURT:        What we're going to do in that final phase, I'm going to
>                   define aggravating circumstances.  I'm going to tell you
>                   what they were and the final phase the Court is going to tell
>                   you what mitigating factors there has been evidence on, what
>                   you should consider and then you're going to have to make a
>                   factual decision were these proven and how do they weigh.
>                   That's what you decide, see?
> MS. RISLEY:       Right, and you're asking can I do that and I'm saying yes.

(Doc. 35, at 889-90).

The Court distinguishes Ms. Risley and her expressed willingness to follow the law as instructed by the trial court from a juror who was the subject of a recent Sixth Circuit opinion.  In *Maxwell v. White*, 431 F.3d 517 (6th Cir. 2005), the court held that a juror who had been exposed to media publicity regarding the case was not impartial, denying the petitioner the right to a fundamentally fair trial.  There, the juror, who equivocated several times regarding her ability to fairly decide the case, also stated that, "if the facts prove that [the defendant] is guilty," she would have a "strong belief" regarding the appropriateness of the death penalty.  *Id.* at 540.  The Sixth Circuit held that given the juror's repeated self-expressed doubts about whether she could be fair in rendering a sentencing verdict, her presence on the penalty phase jury had a substantial influence on the outcome of that portion of the trial.  *Id.* at 542.

In the instant case, Ms. Risley expressed no such misgivings about her ability to put aside any personal beliefs and abide by the law as provided to her.  Other than her confusion regarding the definition of "mitigating" and at what point this term would be utilized during trial, she demonstrated a willingness to follow the law.  The *Morgan* holding requires nothing further.  Jones's first ground for relief is not well-taken.

**2. Second Ground for Relief**

Jones next asserts that the trial court excused several venire members with prior felony convictions or pending felony charges.  He claims this action somehow deprived him of the right to be tried by a fair and impartial jury.  The Respondent asserts this claim is procedurally defaulted because defense counsel did not object to these prospective jurors' dismissal and Jones failed to raise this claim on direct appeal.  Jones cannot overcome this procedural default.  Thus, the Court will not entertain the claim on the merits.

Were it to do so, it would find this claim lacks merit.  Under Ohio law, a juror who has been convicted of a felony cannot serve as a juror absent a full pardon.  Ohio Rev. Code § 2961.01.[12]  The United States Supreme Court has never held such statutes or their application in criminal proceedings to be unconstitutional.

**3. Fifth Ground for Relief**

Jones argues in this ground for relief that the prosecution improperly used its peremptory challenges to excuse venire members who equivocated about their ability to impose the death penalty.  Jones raised this as his third proposition of law and the Ohio Supreme Court addressed it on the merits.  Thus, it is not procedurally defaulted.

The United States Supreme Court has guided reviewing courts on how to conduct their analyses in instances where a defendant alleges improper juror inclusion or exclusion.  In *Gray v. Mississippi*, 481 U.S. 648 (1987), the Court determined that, because the right to an impartial jury

---

[12]
Although Jones also claims that one venire member was excused merely because he had felony charges pending against her, the record indicates that the trial court excused her from jury service because "she is currently under felony indictment and scheduled for trial."  (Doc. No. 32, at 256).  Thus, this venire member's own trial would have prohibited her from serving on Jones's jury.

-30-

was so intrinsic to the right to a fair trial, a harmless error analysis could not remedy such a trial defect. *Id.* at 668. Rather than employ a harmless error analysis, a reviewing court must determine "whether [the trial court's] findings are supported by the record." *Wainwright v. Witt*, 469 U.S. 412, 434 (1985).

Subsequently, in *Ross v. Oklahoma*, 487 U.S. 81 (1988), the Court limited *Gray*'s applicability to instances in which the trial court erroneously excluded a juror pursuant to *Witherspoon*. In that case, the defendant argued that his constitutional rights were violated when he was forced to use peremptory challenges to exclude prospective jurors who appeared to favor the death penalty. The *Ross* Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Id.* at 88. Noting that the Court has never held peremptory challenges to be of constitutional significance, the Court held that, "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* While the *Ross* circumstances are somewhat distinct from the prosecution's decision to utilize peremptory challenges, as Jones alleges here, its holding is apposite. Jones cannot reasonably argue that his trial jury not was impartial. Thus, the fact that the prosecution chose to exercise its peremptory challenges to excuse venire members who hesitated about imposing the death penalty is immaterial.

The Ohio Supreme Court did not unreasonably apply Supreme Court precedent when reviewing Jones's claim on direct appeal:

> In his third proposition of law, appellant contends that several errors committed during voir dire require us to order a retrial. First, appellant argues that the prosecutors' use of peremptory challenges to exclude those jurors who expressed reservations about the death penalty denied him his right to a fair and impartial

> jury. This argument lacks merit. It is well established that death-qualifying a jury
> does not deny a capital defendant a trial by an impartial jury. " *State v. Dunlap*
> (1995),  652 N.E.2d 988, 995, quoting *State v. Jenkins* (1984), 473 N.E.2d 264,
> paragraph two of the syllabus. Indeed, prosecutors may even exclude a juror for
> cause when the juror's views on capital punishment "would prevent or substantially
> impair the performance of his duties as a juror in accordance with his instructions
> and his oath." *Wainwright v. Witt* (1985), 469 U.S. 412, 433, followed in *Dunlap* at
> 315, 652 N.E.2d at 995.

*State v. Jones*, 744 N.E.2d 1163, 1171 (Ohio 2001)(parallel citations omitted).  The court correctly

stated the law and found that the prosecution's use of peremptory challenges did not violate

Jones's right to a fair trial under that law.  Jones's fifth ground for relief is not well-taken.

### B. Third and Fifteenth Grounds for Relief - Sentencing Findings

In these grounds for relief, Jones alleges that the trial court gave inadequate weight to the

aggravating circumstances and/or mitigating factors.  He alleges that this improper weighing by

the trial court renders his sentence of death unconstitutional.

In his third ground for relief, Jones contends that the trial court improperly weighed the

aggravating circumstances and mitigating factors.  He argues that the trial court did not assign

adequate weight to his unstable upbringing and familial background as well as the fact that he may

suffer from brain damage because of an injury he received after being hit in the head with a

hammer.  In his fifteenth ground for relief, Jones asserts that because the trial court concluded

Jones knew the difference between right and wrong when committing the offense, it considered

any mental health mitigation testimony pursuant to the (B)(3), rather than the (B)(7) mitigating

factor.[13]  He asserts that because the trial court observed that the victim was a peace officer, it

---

[13]

> The mitigating factor under section (B)(3) permits a fact finder to take into account
> whether, because of mental disease or defect, the defendant did not appreciate the
> wrongfulness of his or her acts.  Ohio Rev. Code § 2929.04(B)(3).  Alternatively, the
>
> (continued...)

assigned more weight to that aggravating circumstance, turning it into a "super" aggravating circumstance.

Jones raised the arguments for both claims in his fourteenth ground for relief on direct appeal to the Ohio Supreme Court.  That court addressed the claim on the merits, finding it did not warrant a reversal of Jones's sentence:

> In his fourteenth proposition of law, appellant challenges two aspects of the trial court's sentencing opinion. First, appellant contends that the court failed to properly consider psychological evidence submitted under R.C. 2929.04(B)(7). R.C. 2929.04(B)(7) requires trial courts to consider, in addition to the specific mitigating factors set forth in R.C. 2929.04(B), "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."

> We conclude that the trial court thoroughly considered the evidence submitted by the appellant under R.C. 2929.04(B)(7). The trial court made specific findings as to the existence of appellant's psychological disorders as required under R.C. 2929.03(F). The court found that this mitigation evidence was entitled to little weight. Specifically, the court weighed against appellant's mitigation evidence other evidence that appellant's psychological disorders did not prevent him from understanding the criminality of his conduct or conforming his conduct to the requirements of the law. The trial court concluded that this evidence, along with evidence that appellant was fairly sophisticated and intelligent, required that the psychological disorders be accorded little weight. The court acted well within its discretion in making this determination. " '[T]he assessment and weight to be given mitigating evidence are matters for the trial court's determination.'" *State v. Mitts* (1998), 690 N.E.2d 522, 532, quoting *State v. Lott* (1990), 555 N.E.2d 293, 305.

> Appellant contends that the trial court's reference to appellant's ability to conform his conduct to the requirements of the law suggests that the court confused appellant's psychological evidence, offered by the defense under the R.C. 2929.04(B)(7) catchall provision, with evidence offered under R.C. 2929.04(B)(3), a provision that makes the defendant's ability to conform his conduct to the requirements of the law a mitigating factor. Appellant's argument lacks any merit.

_____

[13](...continued)
(B)(7) mitigating factor, the so-called "catch-all" mitigating factor, does not require a specific finding of mental defect and simply states that a fact finder may consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."  Ohio Rev. Code § 2929.04(B)(7).

We fail to see how the trial court's alleged weighing of the psychological evidence under (B)(3) rather than (B)(7) could possibly have prejudiced the appellant, especially in light of the fact that the trial court weighed the psychological evidence against other evidence unrelated to (B)(3), namely, appellant's intelligence. In any event, "[t]he process of weighing mitigating factors * * * is a matter for the discretion of the individual decisionmaker." *State v. Fox* (1994), 631 N.E.2d 124, 132. We find no abuse of that discretion here.

In his fourteenth proposition of law, appellant also argues that the trial court improperly accorded "exceptional weight" to the fact that the victim in this case was a law enforcement officer-the R.C. 2929.04(A)(6) aggravating circumstance. Appellant accuses the trial court of creating "a kind of 'super' aggravating circumstance that no amount of mitigation could outweigh." Specifically, appellant challenges the trial court's statement that "the act of killing a police officer who, in the pursuit of his duties is attempting to apprehend a person accused of a felony crime, strikes at the very heart of the justice system."We reject appellant's argument. The trial court never suggested that the mitigating evidence in this case could not outweigh this aggravating factor. The trial court's statement regarding the severity of killing a police officer was not improper. Courts are certainly entitled to consider the gravity of the aggravating circumstances. *See*, *e.g., State v. Keene* (1998), 693 N.E.2d 246, 266-267 (noting that the killing of a witness in order to avoid prosecution is an act that strikes at the heart of the criminal justice system); *State v. Coleman* (1999), 707 N.E.2d 476, 491.

*State v. Jones*, 774 N.E.2d at 1181-1182 (parallel citations omitted).

The Court finds the Ohio Supreme Court's reasoning is not contrary to any United States Supreme Court precedent. A review of the trial court's findings confirms that the Ohio Supreme Court's depiction of the trial court's findings is an accurate one. Moreover, it is questionable whether this Court can address such claims on habeas review. "On collateral review, federal courts are not required to re-examine a state court's good faith findings." *Buchanan v. Angelone*, 103 F.3d 344, 351 (4th Cir. 1996), *aff'd*, 522 U.S. 269 (1998). Nor can this Court sit as a tertiary appellate court once the state appellate and supreme courts have re-weighed the aggravating and mitigating factors and articulated them sufficiently to satisfy the requirements of *Woodson v. North Carolina*, 428 U.S. 280 (1976). In fact, Supreme Court jurisprudence teaches that "the

-34-

sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994)(quoting *Zent v. Stephens*, 462 U.S. 862, 875 (1983))(further citations omitted). Thus, even if this Court disagreed with the outcome of the sentencing proceeding, it has no authority to re-weigh the aggravating circumstances and mitigating factors.

### C. Fourth, Tenth, and Thirteenth Grounds for Relief - Jury Instruction Errors

In these grounds for relief, Jones asserts that the trial court erred in instructing the jury at both phases of the trial. The Court reviews these grounds for relief acknowledging that a federal habeas court may grant relief on the basis of an incorrect jury instruction only if a petitioner demonstrates that a particular instruction is more than merely "undesirable, erroneous, or even universally condemned." *Estelle v. McGuire,* 502 U.S. 62, 72 (1991)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001). Instead, a habeas petitioner must show that, taken as a whole, it is so infirm that it rendered the entire trial fundamentally unfair. *Id.* Thus, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' can [the federal habeas] court grant a writ." *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004)(quoting *Henderson,* 431 U.S. at 154). The Supreme Court noted in *Estelle* that "we also bear in mind our previous admonition that we have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

### 1. Fourth Ground for Relief

In this ground for relief, Jones argues that the trial court provided the jury with a so-called acquittal-first instruction, in which the jury had to first acquit him of the death penalty before considering whether an alternate sentence was appropriate.  Recently, the Sixth Circuit has found a jury instruction constitutionally infirm because the court found it to be an "acquittal-first" instruction.  *Spisak v. Mitchell*, 465 F.3d 684, 709 (6th Cir. 2006).  The *Spisak* court held that the instruction the trial court provided prior to the sentencing phase of the petitioner's trial may have required the jury to unanimously find the presence of  mitigating factors in violation of the United States Supreme Court's holding in *Mills v. Maryland*, 486 U.S. 367 (1988).  *Id.* at 708.  Coupled with the verdict form, which required all twelve jurors to sign whatever verdict they reached, the *Spisak* court held that the "acquittal-first" instruction "'would' lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty."  *Spisak*, 465 F.3d at 710 (citing *Davis v. Mitchell*, 318 F.3d 682, 689-90 (6th Cir. 2003)).

The instruction the trial court provided the jury here did not require the jury to first unanimously reject a death sentence.  First, the trial court clearly fulfilled the mandate set forth in *Mills* when it charged the jury: "It is not necessary that you, the jury, unanimously agree on the existence of a mitigating factor before that factor can be weighed against the aggravating circumstances."  (Doc. No. 28, at 403.)  Thus, jurors were aware that each one of them could make an individual assessment of the weight to assign each mitigating factor.  Moreover, the trial court informed the jury that it should consider a life verdict in the event that *any* juror found that the

state failed to meet its burden:

> You are not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence options.  In other words, you should proceed to consider and choose one of the life sentence options if any one or more of you conclude that State has failed to prove that the aggravating circumstances outweigh the mitigating factors.

*Id.* at 406.

In its opinion issued on Jones's direct appeal, the Ohio Supreme Court recognized the trial court's appropriate sentencing instructions.  Thus, while it held that the trial court did not utilize the language of *State v. Brooks*, 661 N.E.2d 1030, 1042 (1996), which held that Ohio courts must instruct jurors that "a solitary juror may prevent a death penalty recommendation," it found that the trial court satisfied the *Brooks* mandate.  This Court finds the Ohio Supreme Court's opinion was not an unreasonable application of any United States Supreme Court precedent because that court upheld the instruction which complied with the *Mills* mandate as interpreted by *Spisak*. Accordingly, this claim is not well-taken.

### 2. Tenth Ground for Relief

In this ground for relief, Jones argues that the trial court erred when charging the jury at the conclusion of the culpability phase of trial.  Specifically, he claims that the trial court provided an improper definition of reasonable doubt, confused the definitions of prior calculation and design with the definition for purpose, and relieved the state of its burden of proof by instructing the jury that it had to deliberate on Jones's "guilt or innocence."  As the Respondent observes, Jones did not object to these instructions during trial.  Thus, the Ohio Supreme Court reviewed them on direct appeal pursuant to a plain error analysis only.  This claim is therefore procedurally

defaulted.[14]

These claims are without merit in any event.  Jones challenges the trial court's definition of reasonable doubt.  The Sixth Circuit has found that Ohio's statutory definition of reasonable doubt, the definition supplied by the trial court, is constitutional.[15]  *Byrd v. Collins*, 209 F.3d 486, 527 (2000)(citing *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983)).  To offend due process, the instruction must be of the type that could mislead the jury into finding no reasonable doubt when in fact there was some.  *Holland v. United States*, 348 U.S. 121, 140 (1954); *Thomas*, 704 F.2d at 868.  In the present case, the trial court merely read the statutory jury instruction that has been found constitutional.  The instruction, thus, cannot be considered misleading.

Equally without merit is Jones's assertion that the trial court confused the jury by equating the elements of "purpose" with "prior calculation and design."  On direct appeal, the Ohio

---

[14]

Ohio courts have determined that a failure to contemporaneously object to an alleged error constitutes procedural default.  *State v. Williams*, 364 N.E.2d 1364 (Ohio 1977).  If a defendant fails to object to a trial error that would affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim.  *State v. Slagle*, 605 N.E.2d 916, 925 (Ohio 1992).  The Sixth Circuit consistently has held that an Ohio appellate court's review for plain error does not constitute a waiver of its contemporaneous objection rule.  *Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006)(citations omitted).

[15]

That statute reads:
> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.  It is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.
> Ohio Rev. Code § 2901.05(D).

Supreme Court rejected Jones's contention, finding that it was not supported by the trial record:

> The court defined "purpose" as "a decision of the mind to do an act with a
> conscious objective of producing a specific result." It noted that the terms
> "purpose" and "intent" are synonymous. While the court went on to explain how
> the element of "prior calculation and design" relates to the element of "purpose,"
> the court's instruction in no way confused these elements. The court explained that
> "prior calculation and design" means that "the purpose to cause the death was
> reached by a definite process of reasoning in advance of the homicide, which
> process of reasoning must have included a mental plan involving studied
> consideration of the method and means with which to cause the death of another."
> The court further explained that prior calculation and design includes "planning,"
> "a scheme designed to carry out the calculated decision to cause the death."
> Finally, the court noted that prior calculation and design does not include "spur of
> the moment" decisions. We find no error in these instructions. The instructions
> are consistent with the standardized Ohio Jury Instructions and our own definitions of
> these elements. *See* 4 Ohio Jury Instructions (1997), Sections 409.01 and
> 503.01(A)(4); R.C. 2901.22(A)(defining "purposeful" action); *State v. Cotton*
> (1978), 381 N.E.2d 190, paragraph three of the syllabus (defining "prior calculation
> and design").

*State v. Jones*, 744 N.E.2d 1163, 1178-79 (Ohio 2001).

The Ohio Supreme Court's reasoning is sound.  Contrary to Jones's assertions, the trial

court properly instructed the jury regarding these definitions under Ohio law.  Moreover, it held

that the instructions did not mislead the jury thereby directing a verdict on the element of prior

calculation and design.

Finally, Jones argues that the trial court erred when it charged the jury that it must

deliberate on Jones's "guilt or innocence."  The Ohio Supreme Court observed that the trial court

used this term at the conclusion of the culpability phase of trial when it requested that the jury

"'not consider at this time or in any way discuss the subject matter of punishment,'" and

admonished the jury that "its duty was 'confined to the determination of the guilt or innocence of

the defendant.'"  *Id.* at 1179.  The Ohio Supreme Court found that a reasonable juror would have

understood this instruction to mean merely that the jury should address the issue of whether Jones

-39-

committed the crimes with which he was charged.  It concluded that, contrary to Jones's assertions, the trial court did not effectively shift the burden of proof from the State to Jones.  The Ohio Supreme Court's findings are not unreasonable.  This claim has no merit.

### 3. Thirteenth Ground for Relief

Jones argues here that the trial court erred in its penalty phase instructions to the jury.  Specifically, he claims that the trial court instructed the jury that it should determine what was relevant, aggravating evidence.  He also contends, as he did in his fourth ground, that the trial court erred by charging the jury with an "acquittal-first" instruction.  Finally, Jones complains that the trial court instructed the jury not to consider sympathy when rendering its sentencing decision.

Defense counsel did not object to the instruction raised in Jones's first sub-claim, that the jury should consider relevant aggravating circumstances.  He raised it on direct appeal and the Ohio Supreme Court reviewed it for plain error only.  It is therefore procedurally defaulted.  The Court will not review it on the merits.[16]

---

[16]

    In its plain error review, the Ohio Supreme Court found that, while some jurors could have erroneously believed that the trial court was implying that they must determine what is relevant evidence, it found no plain error because "[m]uch of the trial phase evidence was relevant to the aggravating circumstances, the nature and circumstances of the offense, and the asserted mitigating factors."  *State v. Jones*, 744 N.E.2d 1163, 1180 (Ohio 2001)(citation omitted).  Furthermore, it found in its own independent re-weighing that the aggravating circumstances outweighed the mitigating factors.  Thus, it concluded that there was no plain error in the trial court's relevance instruction.

    Jones contends in his Final Amended Traverse that the recent United States Supreme Court case *Brown v. Sanders*, 546 U.S. 212, – , 126 S.Ct. 884 (2006), is instructive here.  In that case, the Supreme Court dispensed with the "weighing" vs. "finding" classification it previously utilized to classify a state's method of determining whether a death sentence is appropriate.  It held that "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its

(continued...)

The Court also will not address Jones's second sub-claim here.  Because it is repetitive of his fourth ground for relief, which the Court addressed, *supra*, the Court will not duplicate its efforts.

Finally, Jones takes issue with the trial court's penalty phase instruction regarding sympathy.  When charging the jury, the trial court stated:

> Circumstances in this case or any lawsuit may arouse sympathy for one party or the other.  Sympathy is a common human experience.  The law does not expect you to be free of such normal reaction.  However, the law and your oath as jurors require you to eliminate sympathy during your deliberations and to disregard it in reaching your verdict.  It is your duty to carefully weigh the evidence, to decide the disputed questions of fact, and then apply the facts as you find them to be to the instructions I have given to you as the law and make a reasoned, moral response to the evidence.

(Doc. No. 28, at 407).  Jones claims that this instruction led the jury to believe that any mitigating factor which evoked a sympathetic response should be excluded from consideration.

On direct appeal, the Ohio Supreme Court summarily dismissed the claim, finding that "[i]t is well established that sympathy and mercy are not relevant sentencing criteria."  *Jones*, 744 N.E.2d at 1180-181.  This finding is not contrary to any United States Supreme Court precedent.

A death-sentenced defendant made a similar argument in *California v. Brown*, 479 U.S. 538 (1987), asserting that an instruction preventing the jury from being swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was

---

[16](...continued)
> adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."  *Id.* at 892 (footnote omitted).  Jones claims that because the jury relied on an improper aggravating factor, the *Sanders* holding dictates a sentencing reversal.  Given its clearly defaulted status, the Court declines to analyze this claim pursuant to *Sanders*.

unconstitutional. *Id.* at 542. The Supreme Court rejected this argument, holding that "[e]ven a juror who insisted on focusing on [the phrase 'mere sympathy'] in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." *Id.* Because the *Brown* holding squarely addresses this issue and the Ohio Supreme Court's decision comports with it, Jones's claim is not well-taken.

### D. Sixth, Seventh, Twenty-First, and Twenty-Sixth Grounds for Relief - Trial Court Errors

In these grounds Jones contends that the trial court erred in several respects. He first alleges that the trial court should have granted defense counsel's motion for a change of venue. He also asserts that the court denied him the right to be represented by counsel of his choosing. Although the Court reviews Jones's claims on an individual basis below, it observes at this juncture that these issues are predominantly issues of state law immune from attack on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). A state law violation may rise to the level of a due process violation only if it created a serious risk of convicting an innocent person. *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir. 1996). Barring this circumstance, a federal court must defer to the state court's interpretation of its own rules of evidence and procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989). A federal court does not act as an additional court of appeals to review a state court's interpretation of its own laws. *Id.*

### 1. Sixth and Twenty-Sixth Grounds for Relief

Jones asserts in his sixth ground for relief that the trial court erred when it denied defense counsel's motion for a change of venue based on the racial makeup of the venire. He asserts that

-42-

because the overwhelming majority of African-Americans reside in the area of Ashtabula County in which the crime took place, few African-Americans were qualified to serve as jurors at his trial because of their familiarity with either the crime or his family.  Thus, he contends, the trial court should have permitted him to be tried in a venue where African-Americans were more likely to serve as jurors.  The Respondent concedes that this claim is not procedurally defaulted because Jones raised it on direct appeal and the Ohio Supreme Court reviewed it on the merits.

The United States Supreme Court has held that a petit jury venire must represent a "fair cross section of the community." *Holland v. Illinois*, 493 U.S. 474, 480 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975).   To establish a prima facie violation of the fair cross-section requirement, the petitioner must show that (1) the group which allegedly was excluded is a distinctive group in the community; (2) the representation of this group in the venire is not reasonable when compared to the number of such persons in the community; and (3) the under representation is due to a systematic exclusion of the group in the jury selection process.  *Duren v. Missouri*, 439 U.S. 357, 367-68 (1979).

Applying this constitutional test, the Ohio Supreme Court found on direct appeal that the trial court did not abuse its discretion in denying counsel's change of venue motion:

> Appellant has satisfied the first prong of the *Duren* analysis. For purposes of the fair cross-section analysis, African-Americans are a distinctive group. *United States v. Buchanan* (C.A.6, 2000), 213 F.3d 302, 310; *United States v. Rioux* (C.A.2, 1996), 97 F.3d 648, 654. However, appellant has not satisfied the remaining prongs of *Duren*. With respect to the second prong, for example, appellant has come forward with no evidence to suggest that African-Americans in Ashtabula County are unfairly represented in venires in relation to their number in the community. He merely alleges that African-Americans were not adequately represented on his particular venire and jury.
>
> Even if the appellant's venire was underrepresentative, the appellant has not presented any evidence of "systematic exclusion" as required under the third prong

-43-

of *Duren.* Appellant must do more than show that his particular panel was
unrepresentative. Where, as here, the trial court relies upon voter registration lists,
the defendant-appellant "must demonstrate that the voter-registration qualifications
are suspect, or that the jury-selection procedure is administered in a discriminatory
manner." *United States v. Ireland* (C.A.8, 1995), 62 F.3d 227, 231. There is
nothing inherently unconstitutional about using voter-registration rolls as exclusive
sources for jury selection. *Moore*, 81 Ohio St.3d at 28, 689 N.E.2d at 9. Because
appellant has failed to demonstrate systematic discrimination, we reject his Sixth
Amendment claim.

*Jones*, 744 N.E.2d at 1172-73.  The Ohio Supreme Court correctly identified the *Duren* test as the

appropriate United States Supreme Court precedent to apply in this instance.  Additionally, it

reasonably applied that test to the facts presented in Jones's case, noting specifically that the voter

registration lists used to comprise the venire were not inherently discriminatory.  Accordingly, this

claim is not well-taken.

In ground twenty-six, Jones asserts that the trial court should have granted a change of

venue based on pre-trial publicity.  Jones failed to raise a change of venue claim on this theory on

direct appeal.  He did, however, raise it in his post-conviction petition.  The post-conviction court

found the claim to be barred by res judicata but alternatively addressed it on the merits.  It is

therefore procedurally defaulted.

Even if not defaulted, this claim lacks merit.  The United States Supreme Court determined

in *Irvin v. Dowd*, 366 U.S. 717 (1961), that finding a jury totally ignorant of a case is difficult.  In

that case, the Court determined that:

> In these days of swift, widespread and diverse methods of
> communication, an important case can be expected to arouse the
> interest of the public in the vicinity, and scarcely any of those best
> qualified to serve as jurors will not have formed some impression or
> opinion as to the merits of the case.  This is particularly true in a
> criminal case.  To hold that the mere existence of any preconceived
> notion as to the guilt or innocence of the accused, without more, is
> sufficient to rebut the presumption or a prospective juror's

-44-

> impartiality would be to establish an impossible standard.  It is
> sufficient if the juror can lay aside his impression or opinion and
> render a verdict based on the evidence presented in court.

*Id.* at 722-23.

Following this precedent, the Sixth Circuit has held that it is sufficient if a juror who has formed an impression as to guilt or innocence from pre-trial publicity can put aside that impression and render a verdict based solely on the evidence.  *Kelly v. Winthrow*, 25 F.3d 363, 368 (6th Cir. 1994), *cert. denied*, 513 U.S. 1061 (1994).  Consequently, a petitioner must point to actual prejudice to succeed on a change of venue claim.

Here, the post-conviction court adequately addressed Jones's claim, finding no error in failing to change the venue of the trial: "[T]he Court finds that the voir dire of the prospective jurors clearly demonstrates on the record that those seated as jurors were not affected by pretrial publicity and that they were able to consider the evidence and the instructions of law in reaching their verdict."  (Doc. No. 26, at 160).  In light of the extensive voir dire the trial court conducted in this case, the post-conviction court's finding was a reasonable application of the *Irvin* and *Kelly* holdings.

### 2. Seventh and Twenty-First Grounds for Relief

In Jones's seventh and twenty-first grounds for relief he alleges that the trial court erred by denying him the right to counsel of his choice.  He contends that because the trial court denied counsel David Per Due's eleventh-hour motion for a continuance, that it effectively eliminated him from serving as Jones's defense counsel.  Jones raised this issue on direct appeal and the Ohio Supreme Court addressed it on the merits.  Thus, it is ripe for habeas review.

The United States Supreme Court held in *Wheat v. United States*, 486 U.S. 153 (1988), that

-45-

a criminal defendant's right to counsel of choice is not unlimited.  In that case, the district court

had refused the defendant the option of substituting his co-defendant's attorney for his own

attorney when that representation would give rise to a potential conflict of interest.  The

*Wheat* Court upheld the district court's decision, observing that "[i]n the circumstances of this

case, with the motion for substitution of counsel made so close to the time of trial, the District

Court relied on instinct and judgment based on experience in making its decision."  *Id.* at 163.

The *Wheat* Court found that a district court must be given "wide latitude" in making its decision to

permit counsel of choice to enter an eleventh-hour appearance and represent a defendant.

   Recently, in *United States v. Gonzalez-Lopez*, – U.S. – , 126 S.Ct. 2557 (2006), the

Supreme Court held that where a district court erroneously denies a criminal defendant the right to

counsel of choice, a reviewing court should not apply a harmless error test to determine if the trial

court's decision prejudiced the outcome of the trial.  Instead, the Court found that an erroneous

decision to deny counsel of choice constitutes "structural error," which does not require a showing

of prejudice to warrant relief.  *Id.* at 2562.   In a case decided subsequent to the *Gonzalez-Lopez*

decision, the Sixth Circuit reasoned that while an essential element to the Sixth Amendment right

to counsel is the right to obtain counsel of one's choice, that right is not an unbridled one.  In

*United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007), the Sixth Circuit utilized a

balancing test to determine whether the defendant had shown "good cause" to warrant a

substitution of counsel.  It held:

> [i]n order to decide whether a district court has abused its discretion [in denying a
> defendant counsel of choice], we must consider the timeliness of the motion; the
> adequacy of the court's inquiry into the defendant's complaint; and whether the
> conflict between the attorney and client was so great that it resulted in a total lack
> of communication preventing an adequate defense.  In addition, consideration of
> such motions requires a balancing of the accused's rights to counsel of his choice

-46-

and the public's interest in the prompt and efficient administration of justice.

*Id.* Although the *Mooneyham* case involves a federal criminal defendant, the Court finds it is applicable by analogy here.

Attorney Per Due filed a notice of appearance and motion for continuance on May 14, 1998, (Doc. No. 25, at 1), two hours after the jury had been sworn in. The trial court held a hearing on the motions the following morning.[17] Per Due spoke first at the hearing, indicating to the trial judge that he had raised the prospect of becoming Jones's lawyer to the court a month earlier when he was before the judge on another matter. He indicated at that time that Jones's family was having difficulty procuring the funds necessary to obtain his services. The trial court also heard from Jones's appointed counsel, David Doughten. Doughten explained that while he believed his relationship with Jones was a good one, he conceded that counsel and Jones disagreed over the trial strategy. He relayed that, "Mr. Jones feels that our goal is to keep him out of the electric chair. He's worried that we're not concentrating on having him acquitted." (Doc. No. 39, at 2082). Doughten also informed the trial court that Jones felt defense counsel's relationship with the prosecution was too cordial and that he preferred it to be more adversarial. Doughten revealed that he and Jones's grandmother, Theresa Lyons, in particular disagreed with counsel's

---

[17]

Although not central to the outcome of this claim, the Court notes that there appeared to be an antagonistic colloquy between Per Due and the trial judge prior to reviewing the substantive issues of the hearing. Upset with the fact that the trial court called his wife, who also served as Per Due's secretary, and told her that Per Due was subject to being held in contempt, Per Due informed the trial judge that he "plan[ned] on going to the State Judiciary concerning [his] conduct." (Doc. No. 39, at 2075). Additionally, after expressing his ire at the court's personal service on Per Due to appear for the hearing, Per Due stated, "You can think it's a joke, Judge. I don't find it humorous at all." *Id.* at 2076. The trial judge responded, "You see me laughing? You do?, " to which Per Due responded, "Yeah." *Id.* at 2077.

focus on the second, rather than the first phase of trial.

The trial court then confirmed with Jones whether Doughten accurately depicted the nature of his dissatisfaction with appointed counsel.  Jones confirmed that the issues he had with appointed counsel stemmed from their focus on the penalty phase:

> They're I feel like they're mostly concerned with saving my life.  I don't see where that's necessary if you're going to save my life.  For what?  To spend the rest of it in jail?  That's not what I want.  I feel if you can't get me off the case, if you can't win the case for me, then you can't do nothing for me.

*Id.* at 2084.  Doughten spoke again, indicating that appointed counsel had conferred with Per Due the evening before and that appointed counsel would have no objection to Per Due joining the defense team.  *Id.* at 2086.

The trial court then asked Per Due whether he would be prepared to proceed with the trial Monday morning.  Per Due responded that he would not.  He stated that he would like at least a four-month continuance to prepare for trial.  Furthermore, when questioned by the trial court, Per Due responded that he would not be interested in serving as co-counsel with appointed counsel. *Id.* at 2090.   The trial court then heard argument from the prosecution, which argued that Per Due's entry in the case was filed as a delay tactic.

The trial court rendered an oral opinion, effectively denying Per Due the ability to serve as counsel for Jones.  First, it noted that under the holding of *State v. Haberek*, 546 N.E.2d 1361 (Ohio Ct. App. 1988), the court must weigh the relationship the defendant had with appointed counsel against the delay in the administration of justice that obtaining new counsel would cause. It found that, because the notice of appearance containing Per Due's signature was filed on a day

-48-

that Per Due actually was out of town, that the document had been prepared previously but not filed until the jury was sworn in.  It also noted that Per Due was unwilling to represent Jones with appointed counsel and asked for a four-month continuance.  The court therefore concluded that Per Due's notice was filed for purposes of delay and in bad faith.  *Id.* at 2110.  The court further observed that because the jury already had been sworn in and jeopardy had attached, if the court delayed the trial, the jury would have to refrain from viewing any media information about the case for the entire four-month delay period.  The court found that this would present a hardship on the jurors.

The court held, moreover, that appointed counsel were experienced at trying capital cases and had successfully tried a capital case on a prior occasion.  Conversely, the court held, Per Due was not approved to handle capital cases by the Ohio Supreme Court.  While the trial court noted that Jones and appointed counsel had some disagreements regarding how to try the case, it did not find that the attorney-client relationship had completely deteriorated.  Finding that the balance tipped in favor of the prompt administration of justice, the trial court denied Per Due's motion for a continuance and his entry into the case.  *Id.*

On direct appeal, the Ohio Supreme Court found that the trial court did not abuse its discretion in denying Per Due's representation of Jones:

> The trial court acted within the bounds of its discretion in denying the motion for continuance. Because the trial had already commenced, the lengthy delay requested by appellant and Per Due would have greatly inconvenienced everyone involved in the case, including the witnesses, the prosecution, the trial court, and the jury, which had already been sworn. Given the timing of the motion, and the fact that appellant had never, up to that point, expressed any concerns about his court-appointed counsel, it was reasonable for the trial court to conclude that the continuance was requested in bad faith and for purposes of delay.
>
> Because Per Due adamantly refused to immediately proceed with trial, the trial

-49-

court's refusal to grant the continuance effectively denied appellant the services of Per Due. We reject appellant's contention that this denial violated his Sixth Amendment right to counsel.

"[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate * * * rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States* (1988), 486 U.S. 153, 159. Thus, "[a] defendant has only a *presumptive* right to employ his own chosen counsel." (Emphasis *sic*.)  *State v. Keenan* (1998), 689 N.E.2d 929, 937.  Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense."  *United States v. Jennings* (C.A.6, 1996), 83 F.3d 145, 148.  In addition, courts should "balanc[e] * * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice."  *Id.* Decisions relating to the substitution of counsel are within the sound discretion of the trial court. *Wheat,* 486 U.S. at 164.

The trial court conducted an extensive inquiry into the appellant's relationship with his court-appointed counsel. The record supports the trial court's determination that any problems between appellant and his attorneys had not led to a total lack of communication. Indeed, both appellant and his attorneys agreed that the lines of communication between them were open. In balancing the accused's right to the representation of his chosen counsel against the interests of the public in the prompt and efficient administration of justice, the trial court correctly found that the public's interests outweighed those of the appellant. Accordingly, we find no abuse of discretion in the trial court's refusal to substitute Per Due for court-appointed counsel. We must therefore overrule appellant's fifth proposition of law.

*State v. Jones*, 744 N.E.2d at 1174-175 (parallel citations omitted).

The Ohio Supreme Court's reasoning is not an unreasonable application of any United States Supreme Court precedent.  The Ohio Supreme Court correctly identified the *Wheat* case as controlling precedent stating that a criminal defendant's right to obtain counsel of choice is not absolute.  Furthermore, it observed that the trial court balanced Jones's right to choose counsel against the hardships the parties, witnesses, and jury would have to endure if it granted Per Due's request for a four-month continuance.  The Ohio Supreme Court's finding that the trial court did

-50-

not abuse its discretion was not clearly contrary to United States Supreme Court precedent.

Not surprisingly, Jones urges this Court to follow the *Gonzalez-Lopez* precedent and similarly find that he need not prove any prejudice to the outcome of the trial before finding that the trial court committed structural error in need of reversal.  The Court cannot so find.  Presumptive to the *Gonzalez-Lopez* holding was that the trial court had *erroneously* denied the defendant the right to counsel.  *Gonzalez-Lopez*, 126 S.Ct. at 2566 ("However broad a court's discretion may be, the Government has conceded that the District Court here erred when it denied respondent his choice of counsel.").  In this case, conversely, the Respondent has made no such concession.  Moreover, the Ohio Supreme Court has found that the trial court did not err in denying Per Due's entry into the case.  Thus, the Court finds the *Gonzalez-Lopez* holding is distinguishable from the circumstances presented here.  Accordingly, Jones's seventh and twenty-first grounds for relief are not well-taken.

### E. Eighth Ground for Relief - Cumulative Error

Jones contends here that he is entitled to relief based on the cumulative errors the trial court committed.  The Court finds that it is foreclosed from reviewing these claims pursuant to the strictures of the AEDPA.  As the Sixth Circuit has held, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied at*, 538 U.S. 947 (2003).[18]  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir.

---

[18]
>     The Court acknowledges that, in a subsequent case, the Sixth Circuit granted habeas relief on cumulative error grounds.  *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003).  Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply.  *Id.* at 748.

2006)(following *Lorraine* and holding that while errors might accumulate to produce unfair trial setting, Supreme Court has never held distinct claims can accumulate to grant habeas relief); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)(same).  Accordingly, Jones is not entitled to relief for this claim.

### F. Ninth and Thirtieth Grounds for Relief - Sufficiency of the Evidence

Jones claims that the State failed present sufficient evidence to support a conviction in two respects.  First, he claims that there was insufficient evidence to prove that he killed Officer Glover with prior calculation and design.  He also claims that the State did not prove the criteria necessary for the jury to find for the aggravating factor under Ohio Revised Code § 2929.04(A)(3).  That statute states that a jury may impose the death penalty in Ohio if it finds beyond a reasonable doubt that the capital offense was committed "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender."  Ohio Rev. Code § 2929(A)(3).  Jones contends that the prosecution failed to demonstrate that he actually committed the robbery of Isaac Coleman, the offense for which he fled when Officer Glover approached him.  Because the State did not prove that he actually committed that robbery, Jones maintains, the jury could not have found him guilty of this death specification.  Jones raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits.  Thus, this Court may address it similarly.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim.  It concluded the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *Biros v. Bagley*, 422 F.3d 379, 392 (6th Cir. 2005).  In applying *Jackson*, this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.'  *Jackson* does not extend to non-record evidence, including newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993)(citing *Jackson*, 443 U.S. at 318).

On direct appeal, the Ohio Supreme Court cogently analyzed Jones's claim, finding it was without merit:

> When reviewing the sufficiency of the evidence to support a criminal conviction, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Stallings* (2000), 731 N.E.2d 159, 171.  "[T]he phrase 'prior calculation and design' * * * indicate [s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim."  *State v. Taylor* (1997), 676 N.E.2d 82, 88. The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they "must amount to more than momentary deliberation." *Id.*  In short, there is no bright-line test for determining the existence of prior calculation and design.  *Id.* at  89.  "[E]ach case turns on the particular facts and evidence presented at trial." *Id.*

> Whether a defendant's prior statement of intent to kill a police officer constitutes evidence of prior calculation and design depends largely upon the totality of other facts and circumstances surrounding the killing. In *State v. Reed* (1981), 418 N.E.2d 1359, 1362-1363, we held that a defendant's isolated statement that "if a cop got in his way [during a robbery] he would blow him away" did not, by itself, establish prior calculation and design when the totality of the facts and circumstances indicated that the killing resulted from an instantaneous deliberation. More recently, in *State v. White* (1998), 693 N.E.2d 772, 779-780, we suggested that such statements could be used to establish prior calculation and design. The distinguishing factor in the *White* decision was the presence of other evidence establishing prior calculation and design. Unlike in *Reed,* the defendant's threat to kill a police officer in *White* was repeated several times. In *White,* there was also evidence presented at trial indicating that the defendant, who was on probation, would do whatever necessary to avoid being returned to prison. Here, as in *White,* the totality of facts and circumstances surrounding the killing, including the manner

-53-

in which appellant killed Officer Glover, clearly indicates that appellant's act of killing was not an instantaneous decision and that his prior statement of intent to kill a police officer was not merely an idle threat. Accordingly, we are willing to consider appellant's threat as evidence of prior calculation and design.

Viewing the evidence in the light most favorable to the prosecution, we find that the jury could have found the element of prior calculation and design proven beyond a reasonable doubt. Shortly before the murder, appellant informed his cousin that he "was going to shoot at the police if they ever tried to arrest him." On the day of the murder, appellant was armed with a .38 caliber revolver. When approached by the police, appellant followed up on his promise to his cousin, executing Officer Glover with two point-blank gunshots to the head. This evidence clearly establishes, beyond a reasonable doubt, that appellant killed Officer Glover with prior calculation and design.

*State v. Jones*, 744 N.E.2d at 1176-177 (parallel citations omitted).

Although the Ohio Supreme Court cited to *State v. Stallings*, instead of *Jackson*, it clearly applied the *Jackson* test. After observing that Jones not only told his cousin he would shoot a police officer who tried to arrest him and that he killed Officer Glover with two, point-blank gunshots to the head, the Ohio Supreme Court found that a reasonable fact finder could determine Jones's premeditation and deliberation. This finding is not an unreasonable application of the *Jackson* test.[19]

Jones argues in his briefs that this Court should not defer to the Ohio Supreme Court's opinion because it relies on the now-discredited *State v. Taylor*, 676 N.E.2d 82 (Ohio 1977). Another judge on this Court held that the Ohio Supreme Court erred in finding prior calculation and design in that case and granted a writ of habeas corpus on that basis. *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003)(Carr., J.). Thus, Jones maintains, this Court should not defer to

---

[19]

The Court notes, moreover, that the Ohio Supreme Court also could have found that Jones's decision to abandon his flight, lie in wait, and then shoot Officer Glover would also indicate prior calculation and design to kill him.

-54-

the Ohio Supreme Court's reasoning on this claim because it cites *Taylor* for support.

The Court finds this argument unpersuasive. The Ohio Supreme Court did not utilize the *Taylor* holding to establish that Jones killed with prior calculation and design. A close reading of its opinion reveals that it merely cited to *Taylor* when articulating the test for finding prior calculation and design. Because this test was not undercut by *Taylor v. Mitchell*, the Court finds Jones's argument that the Ohio Supreme Court's citation to *Taylor* somehow undermines its analysis of the claim is unconvincing. This claim is not well-taken.

Jones also takes issue with the jury's finding of the (B)(3) aggravating factor. He contends that there was insufficient evidence presented during trial for the jury to find that he killed while attempting to evade apprehension for the commission of another offense. On direct appeal, the Ohio Supreme Court opined that this claim lacked merit:

> Appellant also argues in his eighth proposition of law that the state failed to prove that he killed Officer Glover for the purpose of escaping apprehension for aggravated robbery, the first death penalty specification. Appellant contends that the prosecution bore the burden of proving his commission of the aggravated robbery offense beyond a reasonable doubt.
>
> The state argues that appellant waived this claim by failing to raise the issue at trial. We disagree. Appellant's "not guilty" plea preserved his right to object to the alleged insufficiency of the evidence proving the prior offense. *See State v. Carter* (1992), 594 N.E.2d 595, 599.
>
> R.C. 2929.04 sets forth the criteria for imposing the sentence of death for the commission of a capital offense. The statute provides that the death penalty may be imposed when it is proven beyond a reasonable doubt that the capital offense "was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense *committed by the offender.*" (Emphasis added.) R.C. 2929.04(A)(3). Appellant contends that, under this statute, the state must prove that the defendant committed the offense for which he sought to avoid apprehension by proof beyond a reasonable doubt. We agree.
>
> Appellant's interpretation of R.C. 2929.04(A)(3) is consistent with both the statute's plain language and established constitutional law. R.C. 2929.04(A) plainly states

-55-

that all of the aggravating circumstances listed therein, including that contained in subsection (A)(3), must be proven beyond a reasonable doubt. Indeed, conviction under any lesser standard of proof would be inconsistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It is axiomatic that the state must prove each and every element of an offense beyond a reasonable doubt. *See Jackson v. Virginia* (1979), 443 U.S. 307; *In re Winship* (1970), 397 U.S. 358.  We find that the defendant's commission of the prior offense constitutes an essential element of the R.C. 2929.04(A)(3) specification.  Had the General Assembly intended that the death penalty be applied to those who simply attempt to avoid apprehension on a warrant, it would not have included the words "committed by the offender."

We conclude, however, that in the case *sub judice,* the state proved, beyond a reasonable doubt, that appellant had committed the prior offense for which he sought to avoid apprehension.  The state introduced evidence that a week before the killing, appellant told his cousin Jimmie Ruth that he "was facing a lot of time for robbing Isaac Coleman."  Appellant's admission proves beyond a reasonable doubt that he committed the prior offense of aggravated robbery. We therefore affirm appellant's conviction on the R.C. 2929.04(A)(3) specification.

*Jones*, 744 N.E.2d at 1177-178 (parallel citations omitted).  Here the Ohio Supreme Court

reasoned that Jones's own admission of the robbery was sufficient to find that he had committed

it.  This Court does not find this reasoning to be clearly contrary to *Jackson*.  Moreover, this Court

must defer to a state court's interpretation of its own law.  *See Richey v. Bradshaw*, 546 U.S. 74, –

, 126 S.Ct. 602, 604 (2005)("We have repeatedly held that a state court's interpretation of state

law, including one announced on direct appeal of the challenged conviction, binds a federal court

sitting in habeas corpus.")(citing *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Mullaney v.

Wilbur,* 421 U.S. 684, 691 (1975)).  Jones's ninth and thirtieth grounds for relief are not well-

taken.

### G. Eleventh Ground for Relief - Failure to Merge Aggravating Factors

Jones asserts that the trial court erred when it failed to grant the defense's request to merge

the two death penalty specifications.  He claims that the trial court's decision was a violation of

-56-

state law which dictates that when two or more aggravating circumstances arise from the same course of conduct, then merger of these circumstances is required under *State v. Jenkins*, 473 N.E.2d 265, ¶ 5 of the syllabus (Ohio 1984).  He claims this failure was also a violation of his Eighth and Fourteenth Amendment rights.

On direct appeal, the Ohio Supreme Court found that the trial court did not err in failing to merge the aggravating factors because each factor arose from a different course of Jones's conduct:

> Appellant's act of fleeing and his killing of Officer Glover were part of a divisible course of conduct. Therefore, merger of the R.C. 2929.04(A)(3) and (A)(6) death penalty specifications was unnecessary. Appellant's purpose to escape apprehension for his prior robbery offense is demonstrated by his fleeing when Officer Glover approached him at the Chapman home. Although appellant killed Officer Glover after fleeing, the circumstances surrounding the killing reveal that it was a distinct, divisible act. When appellant had drawn his weapon and aimed it at Officer Glover, he had stopped running. Appellant fired shots at Officer Glover while walking toward him. Appellant's killing of Officer Glover was clearly a separate act, which demonstrated a separate animus. The killing was in no way implicit in appellant's decision to flee Officer Glover. *Id.  See, also*, *White,* 693 N.E.2d 772 (R.C. 2929.04[A][3] and [A][6] specifications treated as separate).

*State v. Jones*, 744 N.E.2d 1163, 1179 (Ohio 2001).  The Ohio Supreme Court's finding of fact regarding Jones's conduct prior to and after the murder and its application of state precedent was not contrary to any United States Supreme Court holdings.  The court reasonably concluded that Jones's act of fleeing was by no means a necessary consequence of him abandoning his retreat and advancing to kill Officer Glover.  Thus, the Court cannot find that the Ohio Supreme Court's decision unreasonably applied any United States Supreme Court precedent.  In so finding, the Court concludes that this claim lacks merit.[20]

---

[20]
     Moreover, the Court finds that the *Brown v. Sanders*, 546 U.S. 212, – , 126 S.Ct. 884 (2006) holding is inapposite.  As stated above, the *Sanders* Court dispensed with the

(continued...)

### H. Twelfth and Thirty-Fourth Grounds for Relief - Prosecutorial Misconduct

Jones maintains that the prosecution committed several errors during his trial by misstating the law and implicating, when cross-examining a witness, that Jones committed another murder. He claims that these errors prejudiced the outcome of his trial.  Because defense counsel failed to object to some of these alleged errors, the Ohio Supreme Court reviewed them for plain error only. Thus, some of these sub-claims are procedurally defaulted.

To assert a successful prosecutorial misconduct claim in a habeas proceeding it "'is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Spisak v. Mitchell*, 465 F.3d 684, 713 (6th Cir. 2006)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974))(further citations omitted).  This question must be answered in light of the totality of the circumstances in the case. *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).  The prosecutor's comments must be so egregious as to render the trial fundamentally unfair.  *Fussell v. Morris*, 884 F.2d 579 (6th Cir. 1989)(Table).

The Sixth Circuit held in *Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000), that a district

---

[20](...continued)
"weighing" vs. "finding" classification it previously utilized to classify a state's method of determining whether a death sentence is appropriate.  It held that "[a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."  *Id.* at 892 (footnote omitted).  In the instant case, the Ohio Supreme Court found that because the facts that established each aggravating factor were distinct, the trial court did not err in failing to merge them. Thus, unlike the circumstances in *Brown*, there was no invalid aggravating factor present that would have added an improper weight to the aggravation side of the scale.

court should first determine whether the challenged statements were, in fact, improper, and if so, to determine whether the comments were "flagrant," thus requiring reversal.  *Id.* at 717. Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of evidence against the accused.  *Id.* (citation omitted).

### 1. Twelfth Ground for Relief

In this ground for relief, Jones claims that the prosecution prejudiced him by making erroneous remarks on three separate occasions.  First, he maintains that the prosecution misled prospective jurors when it stated that jurors could determine what was mitigating evidence on several occasions.  Defense counsel failed to object to these statements during voir dire and the Ohio Supreme Court reviewed this claim on direct appeal for plain error.  This claim is therefore procedurally defaulted.

Even if it were ripe for habeas review, this claim would lack merit.  In its plain error review, the Ohio Supreme Court found that the statements were not improper because "[t]he prosecution merely reminded prospective jurors that it was their duty to determine what evidence does in fact mitigate [Jones's] crime and what weight to give this evidence."  *State v. Jones*, 744 N.E.2d at 1182.  The Ohio Supreme Court's reasoning is not clearly contrary to the *Donnelly* holding.  It reasonably found, contrary to Jones's assertions, that the prosecution did not misstate the responsibilities of a capital sentencing jury.

Jones also asserts that the prosecution erred when, during opening statements of the penalty phase, the prosecutor argued:

-59-

> The State of Ohio submits to you you've been presented with no mitigating factors
> to give any weight to them whatsoever.  There's nothing can mitigate what this
> defendant did in this case.  Nothing whatsoever that can mitigate the fact that he
> killed a police officer in the line of duty.  He knew Officer Glover was a cop, and
> he was doing it to try to get away.

(Doc. No. 28, at 383).  Defense counsel did not object to these statements during trial.  Thus, the Ohio Supreme Court reviewed this claim for plain error on direct appeal.  This claim is procedurally defaulted.

It also lacks merit.  In its plain error review, the Ohio Supreme Court found that the prosecutor did not err when making these statements.  It opined that, "[i]t is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion."  *Jones*, 744 N.E.2d at 1182.  It also found that, pursuant to Ohio law, "[a] prosecutor may offer his or her opinion if it is based on the evidence presented at trial." *Id.*  The Ohio Supreme Court's findings are clearly not contrary to or an unreasonable application of *Donnelly* or other United States Supreme Court precedent.  Additionally, as the Ohio Supreme Court observed, any error in the prosecutor's statements was cured by the fact that the trial court instructed the jury that statements and arguments by the attorneys are not evidence.

Jones asserts that prosecutorial misconduct also occurred during the cross-examination of defense witness Charles See.  After questioning Mr. See regarding an incident where Jones was struck with a hammer by a fellow gang member, Emasio Hull, the prosecutor queried whether Mr. See was aware that, subsequent to the hammer incident, Mr. Hull was murdered.  (Doc. No. 27, at 169).  Defense counsel objected to the question and the trial court instructed the jury to disregard

it.

Jones maintains that the prosecutor's statements, and the trial court's sustaining of the objection without explanation, led jurors to believe that he was responsible for the murder of Hull. Jones raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits. It is therefore preserved for federal habeas review. The Ohio Supreme Court found that the prosecutor's remark was not prejudicial because the trial court sustained the defense's objection and the trial court instructed the jury to disregard the question. *Jones*, 744 N.E.2d at 1182. Holding that juries are presumed to follow a trial court's instructions, the court dismissed the claim.

The Court finds the Ohio Supreme Court did not unreasonably apply *Donnelly* or its progeny when reviewing this claim. As stated above, a prosecutor's remark must be reviewed for its prejudicial effect on the trial under the totality of the circumstances. Here, while it was improper for the prosecutor to ask Mr. See whether he knew about Hull's murder, the question was isolated and the trial court immediately instructed the jury to disregard it, stating that "[i]t has no relevancy at all as far as the Court can see to this action." (Doc. No. 27, at 169). This claim is not well-taken.

### 2. Thirty-Fourth ground for relief

Finally, Jones asserts in this ground for relief that the prosecution elicited testimony from witnesses that it knew to be false and induced such false testimony with plea bargains. In both the Amended Petition and Final Amended Traverse, Jones fails to specify which witnesses testified falsely or to supply any detail regarding plea bargains between witnesses and the State.

Accordingly, the Court finds that this claim is too vague to be addressed on habeas review.[21]

## I. Fourteenth, Seventeenth, Eighteenth, Twenty-Second, Twenty-Fourth, Twenty-Ninth, and Thirty-First Grounds for Relief - Ineffective Assistance of Counsel

In these grounds for relief, Jones argues that his counsel were ineffective at various stages of their representation of him.  He claims counsel were ineffective during voir dire, pre-trial, and the culpability and penalty phases of his trial.  The Respondent asserts a procedural default defense to some of these claims.  The Court will review the defaulted status of each claim on an individual basis.  At this juncture, the Court sets forth the applicable law pertaining to ineffective assistance of counsel claims.

To assert a successful ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner must demonstrate counsel's errors were so egregious "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Second, the petitioner must show he or she was prejudiced by counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

A petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466

---

[21]

Jones also asserts in this claim that the trial court and defense counsel erred because they failed to investigate the case thoroughly and to demand that the trial judge recuse himself. As these claims are either addressed in other grounds for relief raised in the Petition and Amended Petition or are ill-defined, the Court will not address them here.

U.S. at 690.  A reviewing court must strongly presume counsel's conduct was reasonable and might be part of a trial strategy.  *Id.* at 689.   "'Judicial scrutiny of a counsel's performance must be highly deferential'" and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Cone v. Bell*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

### 1. Fourteenth Ground for Relief

Jones contends here that counsel were ineffective on numerous occasions during voir dire, the culpability phase, and the penalty phase of his trial.  Specifically, he asserts that counsel were ineffective for failing to: (a) object to prospective juror Lance McCollum; (b) object to testimony regarding medical efforts to save Officer Glover's life; (c) request the merger of the two death specifications until after the culpability phase of trial; (d) request the dismissal of the death specification pursuant to Ohio Revised Code § 2929.04(A)(3); (e) object to the relevancy instruction that permitted the jury to decide what evidence was relevant during the penalty phase of trial; (f) object to prosecutorial misconduct; (g) object to the admission of trial exhibits regarding Officer Glover's medical treatment during the penalty phase of trial; and, (h) focus and highlight certain mitigatory facts during the penalty phase of trial.

-63-

**a. sub-claims (b), (d), (e), (f), and (g)**

These sub-claims are each raised as distinct grounds for relief in the Petition and Amended Petition.[22]  Because the Court has reviewed these claims previously and finds that they are without merit, Jones's assertion that counsel were ineffective for failing to raise these issues during the trial are also without merit because he cannot show the prejudice he must to succeed on an ineffective assistance of counsel claim.  *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006)("We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier.").  Thus, regardless of their defaulted status, the Court finds that they are not well-taken.

**b. sub-claim (a)**

Jones contends here that counsel were ineffective for failing to request that Juror Lance McCollum be dismissed for cause.  As the Ohio Supreme Court found, Juror McCollum stated during voir dire that he previously had discussed the case with his father-in-law, who was the former chief of police of Ashtabula.  *Jones*, 744 N.E.2d at 1171.  He expressed uncertainty whether or not he could be impartial in deciding the case.[23]  Ultimately, however, McCollum

_____

[22]

  Sub-claim (b) was raised in the eighth and thirty-third grounds for relief; sub-claim (d) was raised in the ninth ground for relief; sub-claim (e) was raised in ground for relief thirteen; sub-claim (f) was raised in ground for relief twelve; and, sub-claim (g) was raised in ground for relief eight.

[23]

  After the court questioned Mr. McCollum about his ability to put aside what he had heard about the case and decide it on the evidence presented he expressed some reservations, stating:

> I'm perfectly willing to listen to all sides and weigh it, but I can't tell you how much bias I have or don't have and whether or not it will come into play.  I don't know.  I've had that exposure, it can't
>
> (continued...)

-64-

stated that he would follow the law by placing the burden of proof on the State.  While the trial court did not excuse McCollum for cause, defense counsel used a peremptory challenge to exclude him from serving on the jury.

On direct appeal, the Ohio Supreme Court found no error in counsel's failure to assert that Juror McCollum should be excused for cause:

> First, appellant contends that he received ineffective assistance of counsel when, during voir dire, his counsel failed to move that Juror McCollum be excused for cause on the basis of that juror's alleged bias. Above, we noted that Juror McCollum indicated to the trial court that, if selected as a juror, he would follow the law and would assume appellant's innocence. We have already held that the trial court did not err in declining to excuse this juror sua sponte.  Thus, defense counsel could quite reasonably have concluded that a motion to dismiss Juror McCollum for cause would not have been successful.  "Counsel need not raise meritless issues or even all arguably meritorious issues." *Taylor,* 676 N.E.2d at 97. The record reveals that defense counsel instead used one of its peremptory challenges to exclude Juror McCollum. These kinds of tactical decisions fall "well within the range of professionally reasonable judgments." *Strickland,* 466 U.S. at 699.

*Jones*, 744 N.E.2d at 1183.  This holding is not clearly contrary to *Strickland* or its progeny.  Because McCollum stated several times that he would follow the law, counsel could not be expected to argue that the trial court should excuse him for cause.  Instead, trial counsel made the strategic choice to exercise a peremptory challenge to exclude him from the jury.  The Ohio Supreme Court's opinion noting these facts afforded trial counsel the deference that *Strickland* requires.  This sub-claim has no merit.

### c. sub-claim (c)

Jones argues that trial counsel should have moved to merge two death specifications before

---

[23](...continued)
            be undone.
        (Doc. No. 37, at 1616).

the conclusion of the culpability phase of trial.  Two of the three specifications dealt with the

(A)(6) aggravating factor.[24]  Although trial counsel moved to merge these specifications prior to

the penalty phase of trial, Jones contends that trial counsel's failure to do so before the conclusion

of the culpability phase meant that the jury was required to find all three factors.

On direct appeal, the Ohio Supreme Court held that trial counsel's failure to move the trial court

for merger prior to the penalty phase had no prejudicial effect.  *Id.*

    This Court sees no basis to find the Ohio Supreme Court's opinion on this issue so

unreasonable.  The Court notes that the proper time to perform a merger of death specifications is

strictly a state law issue not subject to this Court's review.  *Estelle v. McGuire*, 502 U.S. 62, 67

(1991).  Moreover, as the Ohio Supreme Court found, there is no indication that trial counsel's

failure to move for merger of the specifications at an earlier time prejudiced the outcome of his

penalty phase proceeding.  The jury considered only two specifications in its sentencing-phase

deliberations.  This sub-claim is not well-taken.

### d. sub-claim (h)

    Finally, Jones contends in sub-claim (h) that trial counsel failed to highlight for the jury

---

[24]

        That factor states in pertinent part:
                (6) The victim of the offense was a law enforcement officer, as defined in
                section 2911.01 of the Revised Code, whom the offender had reasonable
                cause to know or knew to be a law enforcement officer as so defined, and
                either the victim, at the time of the commission of the offense, was engaged
                in the victim's duties, or it was the offender's specific purpose to kill a law
                enforcement officer as so defined.
        Ohio Rev. Code. § 2929.04(A)(6).
                The indictment contained two specifications citing the (A)(6) aggravating
        factor.  One charged that Officer Glover was a peace officer who was engaged in
        his duties at the time of the offense.  Another specification stated that Jones knew
        Officer Glover was a peace officer and that it was Jones's specific intent to kill
        him.  (Doc. No. 23, at 53-4).

certain facts in mitigation.  He claims that the defense should have adduced testimony that his

mother was non-communicative and in need of guidance prior to his birth.  Jones also claims that

trial counsel should have introduced testimony that his mother committed suicide by an intentional

drug overdose.  The Ohio Supreme Court found that this sub-claim lacked merit:

> Finally, appellant argues that he was provided ineffective assistance when defense counsel failed to emphasize to the jury specific facts from mitigation exhibits submitted to the jury. Specifically, appellant challenges defense counsel's failure to point out that, just before appellant was born, a physician had referred to appellant's mother as noncommunicative and in need of guidance. Appellant also challenges defense counsel's failure to point out to the jury that appellant's mother had committed suicide by intentional drug overdose. The record indicates that appellant's defense counsel had presented an abundance of evidence regarding appellant's mother, including her inability to form an attachment with appellant and the effect her suicide had upon him. The subtle tactical choices that appellant now challenges were decisions that lay within the realm of professionally reasonable judgment. We further find that defense counsel's failure to highlight to the jury specific items of mitigation contained in exhibits submitted to it could not have affected the outcome of the trial, especially in light of the weight and gravity of the aggravating circumstances.

*Jones*, 744 N.E.2d at 1184.

Upon reviewing the mitigation phase transcripts, it is clear that the Ohio Supreme Court's

opinion was not an unreasonable application of *Wiggins v. Smith*, 539 U.S. 510 (2003), the

seminal United States Supreme Court opinion on ineffective assistance for failure to present

mitigating evidence.

The *Wiggins* Court held that counsel's failure to investigate and present to the jury

mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to

discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[25]  The

---

[25]  The Court noted the extensive hardships the petitioner faced during childhood:
> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his
>
> (continued...)

Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.   While *Strickland* established that strategic decisions generally are not subject to challenge, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  *Id.* Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under *Strickland*.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Rompilla v. Beard*, 545 U.S.374, 390 (2005)(internal quotation marks and citations omitted); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).

Unlike the circumstances in *Wiggins*, defense counsel here were aware of Darlene Jones's

_____

[25](...continued)
        siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  . . . Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.
  *Id.* at 516-7 (citations omitted).

ambivalent feelings towards her son.  More importantly, counsel presented this information during the mitigation hearing through the testimony of Jones's Aunt, Carlotte Owen.  She stated that Darlene Jones would at times be interested in caring for Jones but because of her drug usage, she often "didn't really have time for him."  (Doc. 27, at 91).  Ms. Owen also stated that she believed Darlene Jones's drug overdose was a suicide because she previously had spoken about committing suicide.  Counsel also elicited testimony from Ms. Owen regarding the effects of Darlene Jones's death on Jones.  She stated that after his mother's death, Jones appeared withdrawn.  Queenie Kelly, the sister of Jones's foster mother also testified that Jones was "devastated" by his mother's death.  *Id.* at 118.

It is clear that counsel investigated and presented the bulk of the testimony that is the subject of this sub-claim.  Jones's primary complaint appears to be with the degree and manner counsel presented such testimony.  Rather than eliciting testimony regarding Darlene Jones's feelings of ambivalence towards Jones that she harbored after his birth, Jones claims that counsel were ineffective for failing to present evidence of her feelings prior to his birth.  *Strickland* does not countenance this subtle, tactical second-guessing of counsel's strategy.  Because counsel investigated and presented the testimony about which Jones complains in this sub-claim, the Court finds that the Ohio Supreme Court's similar finding was not contrary to the *Strickland* or *Wiggins* holdings.  This sub-claim is not well-taken.

## 2. Seventeenth and Twenty-Ninth Grounds for Relief

In these grounds for relief Jones claims that trial counsel were ineffective both because they were unaware of the prosecution's leniency on Anthony Barksdale in exchange for his testimony and because trial counsel did not attempt to impeach Barksdale based on the dismissal

-69-

of a pending charge of obstruction of justice.  He also faults counsel for failing to offer evidence of Barkdale's drug charge dismissal during the trial.  Jones did not raise this claim on direct appeal but raised it in his post-conviction relief petition.  The post-conviction court and the Eleventh District Court of Appeals addressed the claim on the merits.  This Court may therefore conduct a similar review.

Jones's claims are unsupported by the record.  First, as the post-conviction court observed, the prosecution indicated in a letter to trial counsel that Barksdale agreed to plead guilty to an obstruction of justice charge and a drug abuse charge was dismissed against him.  (Doc. No. 26, at 117).  In exchange for truthful testimony, the prosecution promised to "take this into consideration at the sentencing hearing."  *Id.*  Moreover, counsel did raise this issue during their cross-examination of Barksdale at trial:

Q: Did anybody indicate to you what your sentence would be for testifying?

A: No.

Q: At no time did anybody say to you that, if you testify favorably, it's going to help your sentencing?

A: It could.

Q: Who told you that?

A:  My lawyers. My lawyer.

Q: Did they get that information from the prosecutor, do you know?

A: Could be.

(Doc. No. 40, at 2277).  Thus, trial counsel were both aware of and noted Barksdale's deal with the State regarding his obstruction of justice charge during trial.

-70-

During post-conviction relief, the court found that Jones's assertion that counsel were

ineffective for failing to offer as evidence Barkdale's dismissal of the drug abuse charge was

without merit:

> Counsel for the Defendant-Petitioner was aware of the plea agreement and that the witness had admitted guilt to the felony of the third degree, to wit: Obstruction of Justice.  Counsel for the Defendant-Petitioner made a strategic decision not to pursue the dismissal as impeachment evidence and avoided the implication that by pleading guilty to Obstruction of Justice, that the first statement implicating the Defendant-Petitioner was, in fact, the truth.  This is a tactical decision to be made by counsel and does not provide substantive grounds to determine that counsel's assistance was ineffective.  Substantial efforts were made by Defense Counsel to impeach the witness on other issues, to-wit: the inconsistent statements he had given to the police department.  There was no duty upon counsel to attempt to impeach the witness on every possible ground, especially when impeachment on the plea agreement might infer that, by pleading guilty to Obstruction of Justice, the second statement given, which exonerated the Defendant-Petitioner, was untruthful.

*State v. Jones*, No. 97-CR-221, (slip op.), at 20 (Ohio Ct. Common Pleas Oct. 26, 2000).tech.(Doc.

No. 26, at 146).  The Eleventh District Court of Appeals affirmed the post-conviction court's

decision, finding that Jones failed to offer factual support for his claim.  *State v. Jones*, No. 2000-

A-0083, 2002 WL 737074, at *5 (Ohio Ct. App. Apr. 26, 2002).

Neither courts' decision is an unreasonable application of *Strickland*.  As the Court

observed above, the record does not support Jones's claim that counsel were unaware of or failed

to utilize the deal between the State and Barksdale.  Moreover, as the post-conviction court

reasoned, there is a strong probability that counsel's decision not to further impeach Barksdale

with the dismissal of the obstruction of justice charge was a strategic choice not to highlight his

implication of Jones in the murder.  Finally, because counsel impeached Barksdale's testimony

based on his inconsistent police statements, Jones is hard pressed to demonstrate that counsel's

failure to further impeach him because they did not more extensively question him regarding his

-71-

deal with the State was prejudicial to the outcome of the trial.

### 3. Eighteenth Ground for Relief

Jones asserts once again that counsel were ineffective for failing to investigate and present mitigating testimony.  The Court addressed part of this claim in Jones's fourteenth ground for relief and will not re-address it here.  In his post-conviction petition, Jones asserted that counsel were ineffective for failing to present evidence about his troubled childhood, the head injury he received when he was hit in the head with a claw hammer, and his psychological history.  He also asserts that counsel were ineffective because they did not call his father and paternal grandmother to testify during trial.  These claims are not procedurally defaulted.

On appeal from the denial of post-conviction relief, the Eleventh District Court of Appeals carefully reviewed this claim and found that it lacked merit:

> In the instant matter, while appellant's father and paternal grandmother did not testify as to their absence from appellant's life, the following testimony was introduced during the penalty phase of appellant's trial: appellant's foster mother, Theresa Lyons ("Theresa"), testified that appellant did not know who his father was until he was thirteen-years old; Charles See ("See"), a mitigation cultural specialist, testified that there was no male role model in appellant's life and that the lack of a father had a devastating affect on appellant; appellant's aunt, Carlotte Owen ("Carlotte") testified that appellant's mother did not want a child, that she did not have time for him, and that she spent her time in the streets drinking and doing drugs; she further testified that appellant did not cry when his mother died; Dr. James Eisenberg ("Eisenberg") testified that, as a baby, appellant's mother did not want to feed him, that appellant frequently went to the hospital because it was the only place where people took care of him, and that he gave up when his mother died.

> In our view, additional evidence addressing the issue of lack of family support in appellant's life would have been cumulative of the evidence offered during the penalty phase of appellant's trial.

> The trial court noted in its judgment entry that: "[T]he mitigating factors of personality disorders, exposure to a culture of violence, head trauma, the loss of trust with others, and the effect of [appellant's] mother's death were all extensively

supported by the evidence presented on behalf of [appellant]. * * * [T]he mitigation evidence was presented through expert professional witness[es] [consisting] of [See], [Eisenberg], and [Kinney]. * * * Defense Counsel also called, as mitigation witnesses, [Theresa] * * *, with whom [appellant] resided; Lorraine Rapose, a school teacher, who had [appellant] as a student in seventh grade; [Carlotte], the maternal aunt of [appellant], who testified about his childhood and the background of his mother * * *; Lewis Lyons, the pastor of Apostle Faith Church * * *, who testified about [appellant] and his mother's background; and Queenie Kelly * * *, who testified about [appellant's] background and his devastation, both emotionally and psychologically, caused by his mother's death.

" * * [A]ll of the subject matters of [the testimony of potential witnesses not called by appellant's counsel], to-wit: the absent parenting of the biological father, the noninvolvement in [appellant's] life by his paternal grandmother, his drug use, gang membership, and emotional upset after the death of his mother, * * * Darlene Jones' drug use, criminal involvement, and abnormal home life, the cultural violence in which [appellant] was raised as well as the death of close friends and relatives and its effect upon his psychological and emotional development, the effect of the physical assault by Maceo Hull [sic] and how [it] caused [appellant] to be distrustful of others, and the general violence to which he was exposed were all covered and testified to by those witnesses that were called as mitigation witnesses."

Any additional evidence submitted by appellant would have been cumulative, and such cumulative evidence does not support substantive grounds for an ineffective assistance of counsel claim. *State v. Combs* (1994), 652 N.E.2d 205.

Further, when reviewing a claim of ineffective assistance of counsel, "a court must indulge in a strong presumption that the challenged action might be considered sound trial strategy." *State v. Moore* (1994), 646 N.E.2d 470, citing *Strickland v. Washington* (1984), 466 U.S. 668, 689. The trial court noted in its judgment entry, denying appellant's petition that:

> "[I]t was competent trial strategy for Defense Counsel to present this evidence through expert witnesses and those other witnesses who were generally law abiding citizens of the community. The Court finds that a number of the witnesses that were not called, such as [appellant's] absent father, his uninvolved paternal grandmother, and those witnesses who are currently in prison were all subject to being impeached and discredited due to their noninvolvement in [appellant's] life and/or their criminal and drug use history. Counsel for [appellant] elected to present the mitigation evidence through witnesses who would most likely be credible in the eyes of the jury."

-73-

In connection with this first issue, appellant also submits that his trial counsel was ineffective because he failed to obtain medical records demonstrating that appellant received follow-up care for a head injury suffered as a result of being struck by a hammer in the course of an assault by his cousin. Appellant asserts that this failure undermined the physical and psychological impact that the assault had on appellant.

There was substantial testimony as to the nature and extent of appellant's injuries during the penalty phase. Theresa testified that, as a result of the assault, appellant was transported by helicopter to Metro Health Medical Center. Dr. John Kenny ("Dr. Kenny"), a neuropsychologist, testified that the head injury resulted in irritability and paranoia that lowered appellant's threshold for aggressive outbursts. See testified that the hammer attack left appellant greatly disillusioned because his cousin, who was also a close friend of appellant, inflicted the injury.

Also, regardless of whether appellant received follow-up treatment, the severity of his injuries from the hammer attack would have been minimized by the testimony of Dr. Robert White ("Dr. White"), the neurosurgeon who operated on appellant at Metro Health Medical Center. Dr. White testified that the surgery was "not a major operation", and that after the operation "we were looking at, for all practical purposes, * * * a perfectly healthy, young man." He concluded his testimony with the statement that "the degree of the injury itself regarding the brain borders on almost being insignificant." In view of this testimony, we conclude that the result of the penalty phase of appellant's trial would not have been different had defense counsel offered evidence that appellant did, in fact, receive follow-up treatment for his head injuries.

*State v. Jones*, No. 2000-A-0083, 2002 WL 737074, at *2-4 (Ohio Ct. App. Apr. 26, 2002).

The appellate court's studied decision is not an unreasonable application of or contrary to the *Strickland* or *Wiggins* holdings.  After thoroughly reviewing the wealth of mitigation testimony that trial counsel chose to present, the Eleventh District Court of Appeals found that further information and testimony would have been cumulative.

This case is similar to *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002), in which the Sixth Circuit held that a habeas petitioner is not entitled to relief based on an ineffective assistance of counsel claim unless he or she can prove that counsel's alleged failures prejudiced the outcome of the state court proceeding.  There, the petitioner alleged that counsel was ineffective for failing to

-74-

investigate and present mitigating evidence.  On habeas review, the district court found ineffective assistance based on trial counsel's failure to develop evidence of the petitioner's organic brain damage.  *Id.* at 434.  The Sixth Circuit reversed, holding that the petitioner failed to demonstrate that trial counsel's failure to investigate prejudiced the outcome of the penalty phase when habeas counsel could find no evidence that the petitioner was actually brain damaged.  *Id.* at 436.

Like the *Lorraine* petitioner, Jones does not state what information trial counsel failed to uncover regarding his past that was not already introduced during trial.  Although he asserts that counsel should have called his father and paternal grandmother to testify that they were absent from his life, both Lyons and Carlotte testified that Jones had no contact with his father.  Moreover, there was extensive testimony adduced during trial from both Dr. Eisenberg and Dr. Kenny regarding Jones's head injury.  Charles See also testified about the psychological, physical, and emotional effects of this injury.  They also testified about the emotional repercussions of Darlene Jones's suicide when Jones was only thirteen years old.  Jones cannot demonstrate that counsel's alleged failure to present further evidence of his childhood, psychological history, and head injury would have altered the outcome of penalty phase proceedings.  Without making such a demonstration, this claim is not well-taken.

### 4. Twenty-Second Ground for Relief

Jones argues here that counsel were ineffective for failing to question venire members regarding their feelings about race and the fact that he was an African-American defendant who was accused of killing a white police officer.  Jones did not raise this claim on direct appeal but asserted it in post-conviction relief proceedings.  Although he attached an affidavit from an attorney-expert, the Eleventh District Court of Appeals ruled on appeal from the denial of post-

-75-

conviction relief that the affidavit was insufficient evidence *de hors* the record to raise it in post-conviction relief proceedings in the first instance.  Accordingly, the court found that the claim could have been raised on direct appeal and was barred by res judicata.  *State v. Jones*, No. 2000-A-0083, 2002 WL 737074, at *6 (Ohio Ct. App. Apr. 26, 2002).[26]

### 5. Twenty-Fourth Ground for Relief

Jones argues in this ground for relief that his counsel were ineffective for inadequately preparing the defense experts for testimony.  Consequently, Jones maintains, counsel elicited testimony that was both conflicting and damaging.  Jones raised this claim in his post-conviction relief petition.  On appeal from denial of that petition, the Eleventh District Court of Appeals held that it was barred by res judicata because the claim was supported by the trial record and therefore could have been raised on direct appeal.  *State v. Jones*, No. 2000-A-0083, 2002 WL at *6.  This claim is thus barred from federal habeas review.

Were it ripe for review, it would not be well-taken.  Jones contends that during the mitigation hearing his experts presented conflicting testimony about the results of a psychological test.  While Dr. Eisenberg, the defense psychologist, said that Jones's malingering (or purposely manipulating the test results) rendered the test results invalid, Dr. Kenny opined that the results were "marginally valid."  (Doc. No. 28, at 269).  He explained that portions of the test in question were less susceptible to malingering and, thus, he accepted the validity of those portions in forming his medical opinions.  Thus, while Dr. Kenny accepted part of the test results and Dr. Eisenberg rejected them completely, these partial differences in medical opinion do not constitute

---

[26] This claim lacks merit in any event.  Contrary to Jones's assertions, counsel did question venire members regarding their ability to set aside the race of the defendant and victim. (Doc. No. 35, at 932, 1087-88).

conflicting testimony that likely would have influenced the jury's sentencing verdict.

Jones also recasts the testimony of Charles See, the defense's cultural expert, by asserting that he stated Jones was capable of "self-determination," *i.e.*, Jones could have chosen not to shoot Officer Glover. During direct examination, counsel adduced extensive testimony from See regarding the effects that a culture of drugs, prison, family dysfunction, and gangs in an urban setting have on African-American males both generally and in Jones's case in particular. In fact, counsel specifically questioned See about Jones's ability to make choices in his life and See provided a thorough answer:

> Q:     I think the concern that we all have is I think all people in your Community
>
> Reentry Program and Odraye, didn't they have an opportunity to make a
>
> different choice? I mean, couldn't they have gone to college, if they wanted
>
> to? What prevented them? Couldn't they have had full-time employment,
>
> if they wanted to? Aren't we making excuses for them?
>
> A:     Well, I'm certainly not making excuses. What I'm doing is recognizing significant
>
> contributing factors to what impacts a youngster as that youngster grows up and
>
> tries to make sense out of a world of chaos and, when you talk about choices, six
>
> year olds and ten year olds and 13 year olds living in these kinds of environments
>
> don't have the personal resources to make positive choices and by that I mean – I
>
> want to clear here. I believe people ought to be self reliant. I believe individuals
>
> and we teach our kids to be self reliant. We teach them to be independent, to be
>
> self directing.
>
> What we understand is that is not a spontaneous occurrence. That those

things have to be learned.  Kids have to be taught that, and they have to be given

opportunity to experience that and those kids who don't get those opportunities, the

choices they make are very, very negative as formed by what their life experience

has been.

Q:     I mean, is it your opinion that they do have a choice and just make the wrong

choice or why aren't there more kids making the right choice in this situation?

A:     Well, I guess, I would explain it this way.  That you raise a youngster in an

environment and, by experience and by example, you teach certain things and then

when that youngster comes, when that youngster gets to a certain point and he

chooses consistently with what his experiences have been, with what he's known,

what he's seen his family do, what he has seen his friends do and what is

acceptable in that culture and in that environment.

So, when he chooses, but he chooses out of his history of what one is to

choose in this culture.

(Doc. No. 27, at 151-53).  As is apparent by this lengthy explanation, defense counsel procured

testimony from See that did not excuse, but attempted to explain, why Jones made the choice to

shoot Officer Glover.  On cross-examination, the prosecution asked See whether Jones chose

whether or not to pull the trigger.  Not surprisingly, See responded affirmatively.  *Id.* at 177.

The fact that the prosecution forced See to admit that Jones could have decided not to

shoot Officer Glover does not render the above extensive colloquy between counsel and See

inadequate or counsel's actions objectively unreasonable.  Surely prosecutors in any mitigation

hearing attempt to minimize the effects of mitigating testimony presented by defense counsel.

-78-

These efforts, however, do not render defense counsel's own performance constitutionally defective.  As is apparent by the questions defense counsel put to See, counsel's attempts to inform the jury about the culture in which Jones was raised and his subsequent choices as a product of that culture were not objectively unreasonable.  This claim is not well-taken.

### 6. Thirty-First Ground for Relief

Jones claims that counsel were ineffective for failing to object when the trial court closed the courtroom during voir dire proceedings.  On April 9, 1998, the trial court held hearings on several motions.  While many of the motion hearings were open to the public, including the media, the trial court closed from public view a hearing on the jury questionnaire.  Jones failed to raise this claim on direct appeal, raising it for the first time in his second *Murnahan* application.  Thus, the claim is procedurally defaulted.

Were it ripe for habeas review, it would not be well-taken.  While a criminal defendant generally has a Sixth Amendment right to a public trial, *Globe Newspaper Co. v. Superior Ct. For Norfolk Cty.*, 457 U.S. 596 (1982), "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."  *Waller v. Georgia*, 467 U.S. 39, 44 (1984).

In this case, the trial court stated on the record the reasons for closing the jury questionnaire hearing when it found that certain issues counsel were going to discuss regarding the jury questionnaire "shouldn't be in the paper before we start this jury process . . . ."  (Doc. 29, Tab D, at 12).  Thus, its motivations for closing the courtroom were to provide Jones with an untainted jury pool.

This case is similar to *Horton v. Allen*, 370 F.3d 75 (1st Cir. 2004).  In that case, the trial

court conducted individual juror voir dire in an anteroom outside the presence of the public. Defense counsel did not object to this arrangement and Horton raised this issue as an ineffective assistance of counsel claim in his subsequent habeas petition.  On appeal from a denial of habeas relief, the First Circuit held that Horton could neither establish that counsel was unreasonable for failing to object to the closed voir dire nor that he was prejudiced by this closure under *Strickland*. It held:

> While Horton may have had a right to insist that the entire voir dire be conducted publically, the strategic advantage that he received from the individual voir dire taking place in private cannot be ignored.  Defense counsel's decision to agree to a closed individual voir dire was an objectively reasonable strategy designed to elicit forthcoming responses from the jurors about racial bias.

*Id.* at 82-83.

Similarly, Jones cannot now complain that his counsel failed to object to the closure of the courtroom so that the trial court could hear issues regarding the jury questionnaire as creating it with defense counsel's private input inured to his benefit.  Thus, defense counsel were not unreasonable for failing to object to the courtroom closing.  Moreover, Jones has not demonstrated, as he must under *Strickland,* how he was prejudiced by the trial court's decision. Accordingly, this claim lacks merit.

### J. Sixteenth Ground for Relief - Death Penalty Unconstitutional

Jones's sixteenth ground for relief is aimed at the structure of Ohio's capital punishment scheme.  He asserts Ohio's capital punishment scheme is unconstitutional on its face.  The Court will address each sub-claims but is not persuaded by any of Jones's allegations.  In summary fashion, and regardless of its defaulted status, the Court lists below these allegations, in italics, and thereafter states the reasons they are unpersuasive.

-80-

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.*  The United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *Ohio's scheme is unconstitutional because it fails to require that the State prove the absence of any mitigating factors.*  This argument was specifically rejected in *Walton v. Arizona*, 497 U.S. 639, 649–50 (1990).  There the Court held a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting.  This aspect of the *Walton* holding is unaltered by the Supreme Court decision *Ring v. Arizona*, 536 U.S. 584 (2002).

- *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.*  The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty.  In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence.  *Id.* at 605.  The Court further refined the statutory limiting requirement in *Zant v. Stephens*, 462 U.S. 862 (1983).  In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible.  *Id.* at 177.  Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase.  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).

  Ohio's death penalty scheme complies with these mandates.  First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute.  Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A) before imposing the death penalty.

- *Ohio's scheme is unconstitutional because it pressures capital defendants into pleading guilty rather than exercising their right to trial.*  In *United States v. Jackson*, 390 U.S. 570, 582 (1996), the Supreme Court determined a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial.  In that case, the Court struck down the capital portions of a federal kidnaping statute because it authorized only the jury to impose the death sentence.  Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial."  *State v. Buell*, 22 Ohio St.3d 124, 138 (1986).  Consequently, Ohio's scheme comports with constitutional mandates.

- *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.*  Although the Fifth Amendment would be violated if a court *ordered* a defendant to undergo a psychiatric examination without informing the defendant that his statements can be used against him and then admitted his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith*, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself.  This reasoning is explained in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):

  > A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.  This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.  The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

  *Id.* at 422-23 (citations omitted).

- *Ohio's scheme is unconstitutional because it fails to establish a standard for determining the existence of mitigating factors.*  While the United States Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida*, 420 U.S. 349, 361 (1977), there is no actual criterion stating that the trial judge or jury must identify and articulate the specific factors used to formulate the decision.  Furthermore, Ohio Revised Code § 2929.03(F) requires a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors.  By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness."  *State v. Buell*, 22 Ohio St.3d 124, 138 (1986), *cert. denied*, 479 U.S. 871 (1986).   Thus, no constitutional infirmity exists.

- *Felony murderers are treated more harshly than premeditated murderers.*  Here, Jones presumably is asserting that the Ohio death penalty scheme violates the due process clause because  one of the aggravating factors for capital felony murder merely repeats an element of the crime.  As stated above, the Ohio death penalty comports with Supreme Court jurisprudence that requires a statutory scheme to limit the class of death-eligible defendants.  Moreover, this "double counting" system was upheld in *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1987).  *See also State v. Jenkins*, 473 N.E.2d 264 (Ohio 1984)(noting that under Ohio Rev. Code § 2929.04(A)(7) a state must not only prove that the defendant caused the death of another to establish the aggravating circumstance, but it also must prove that the defendant was the principal offender in the commission of the aggravated

murder, or that the aggravated murder was committed with prior calculation and design.).
This additional factor complies with the narrowing prerequisites set forth in *Lowenfield*.

• *Ohio's scheme is unconstitutional because it fails to set a standard of proof for the jury for the balancing of mitigating factors with aggravating circumstances.* The United States Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase. *Buchanan v. Angelone*, 522 U.S. 269 (1998).

• *Ohio*'s *scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.* No such constitutional mandate exits. Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

• *The death penalty violates the Eighth Amendment prohibition against cruel and unusual punishment.* This argument was rejected in *Gregg v. Georgia*, 429 U.S. 875 (1976)(holding death penalty *per se* not constitutionally barred).

• *Direct appeal to the Ohio Supreme Court violates the Eighth Amendment and Equal Protection Clause.* Jones asserts that Ohio's provision which allows for direct appeal to the Ohio Supreme Court in all capital cases violates his Eighth Amendment rights. He also asserts that his direct appeal to the Ohio Supreme Court, while other similarly situated death row inmates received two levels of appellate review is a violation of his rights under the Equal Protection Clause. The Ohio Supreme Court reviewed this issue extensively in *State v. Smith*, 684 N.E.2d 668 (Ohio 1997), finding that the constitutional amendment requiring direct appellate review to the Ohio Supreme Court did not violate the United States Constitution. Moreover, Jones does not cite to any federal authority finding that this state system does not pass constitutional muster.

• *Imposition of the death penalty is a violation of international treaties.* The Sixth Circuit has held in an Ohio capital habeas case that "Courts have made clear that '[i]nternational law does not require any particular reaction to violations of law.... Whether and how the United States wishes to react to such violations are domestic questions.' *Buell v. Mitchell*, 274 F.3d 337, 375 (6th Cir. 2001)(quoting *Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir.1994)(further citations omitted). *See also State v. Steffen*, No. C-930351, 1994 WL 176906, at *4 (Ohio Ct. App. May 11, 1994)(holding that there was no colorable argument supported by precedent from any human rights forum that the arrest, incarceration, trial, and sentence of an individual violated human norms to which the United States is bound either by customary international law or treaty).

### K. Nineteenth, Twentieth, and Twenty-Third Grounds for Relief - *Brady* Violations

Jones asserts in these grounds that the State withheld exculpatory or impeachment
evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He claims that the prosecution

failed to provide the defense with photographs of injuries he received after he was struck in the head with a hammer.  Additionally, Jones maintains that the State failed to inform him that Barksdale received favorable treatment in exchange for his testimony against Jones and that the murder weapon was found near Officer Glover's body and not near the cite of his arrest, as the State asserted during trial.  Jones raised these claims in post-conviction relief proceedings.  The Eleventh District Court of Appeals addressed them on the merits.  They are therefore preserved for federal habeas review.

To establish a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), "the petitioner has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material."  *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)(citing *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972)).  "The inquiry is objective, independent of the intent of the prosecutors."  *Id.* (citing *Brady*, 373 U.S. at 87).  *Brady* material applies not only to exculpatory evidence, but to evidence that could have been used for impeachment purposes.  *United States v. Blackwell*, 459 U.S. 739, 758 (2006)(citing *United States v. Bradley*, 473 U.S. 667, 676 (1985)).

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999)(internal quotation marks and citations omitted).  The United States Supreme Court has held that defendants are not required to "scavenge for hints of undisclosed

*Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  The duty to disclose exculpatory evidence applies to the prosecution whether or not the defense makes a *Brady* request.  *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court held that a constitutional violation only occurs if the withheld, exculpatory items were material to the outcome of the trial. This test does not require a reviewing court to determine "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.  Moreover, the *Kyles* Court held, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id.* at 436-37.  Thus, there is no requirement that the government maintain an "open file" policy to remain on constitutionally solid footing.  The prosecution must, however, use its discretion in determining the *cumulative* effect of suppression and disclose favorable evidence "when the point of 'reasonable probability' is reached." *Id.* at 437.  Thus, when examining whether favorable, suppressed evidence was tantamount to a constitutional violation, a reviewing court must look at its collective impact on the defendant's due process right to a fundamentally fair trial.   Applying this standard, the Court now turns to Jones's grounds for relief.

### 1. Nineteenth Ground for Relief

Jones contends that the prosecution violated its obligations under *Brady* when it failed to provide the defense with pictures of the head injury he received when Ron Emasio Hull struck him with a claw hammer.  Utilizing the above standard, the Eleventh District Court of Appeals

cogently analyzed this claim:

> In the matter *sub judice,* appellant has failed to show that the photos at issue were gathered as evidence in this case. Instead, they were collected in 1994, in connection with the hammer attack upon appellant.
>
> Even if the prosecution had knowingly withheld the photographs, they do not meet the standard of materiality set forth in *Kyles, i .e.,* a reasonable probability of a different result. The state's witness, Dr. White, discussed at length the consequences of the attack. He testified that "some portions of [appellant's] skull * * * had been fragmented. These had not been driven into the brain, but they had been pushed against the brain. But still the membrane, the dura was protecting the brain. So these were removed. Almost like cooking." He further testified that "[w]e closed the membrane after irrigating the brain, very carefully elevated the membrane up against the bone so there wouldn't be any further bleeding, and simply closed the scalp. We did not put anything back, special kind of prosthesis or another piece of bone in the area that we operated on simply because the actual dimensions of this were not very large * * *."  He also testified that appellant might have suffered a hairline fracture of his mandible, a fracture in the nasal area, and a fracture of one of his fingers.
>
> In addition to Dr. White's testimony as to the physical consequences of the attack, the record also contains the testimony of Dr. Kenny as to the psychological consequences of the attack, appellant's lowered threshold for aggressive outbursts due to the irritability and paranoia that resulted from his head injury. In view of this extensive testimony, we do not believe that the introduction of photographs of appellant's injuries would have created a reasonable probability of a different result.

*State v. Jones*, No. 2000-A-0083, 2002 WL 737074, at *4-5 (Ohio Ct. App. Apr. 26, 2002).

It is clear that the Eleventh District Court of Appeals' decision is compatible with *Brady* and *Kyles*.  It first held that it did not find the photographs actually constituted "evidence" in Jones's trial.  It alternatively concluded that, even if the photographs were construed as evidence withheld from the defense, the extensive depictions of the physical and psychological ramifications of Jones's injury rendered the exclusion of the photographs of the injury an immaterial omission from the trial.  This Court concurs and therefore finds Jones's nineteenth ground for relief is not well-taken.

-86-

**2. Twentieth Ground for Relief**

Jones alleges that the State failed to notify him that Barksdale would receive favorable treatment from it in exchange for his testimony against Jones.  The Court already addressed this issue when it reviewed Jones's seventeenth and twenty-ninth grounds for relief, *supra*, finding that the prosecution indeed notified the defense of this agreement.  On appeal from post-conviction relief proceedings, the Eleventh District Court of Appeals also so found.  *Jones v. State*, No. 2000-A-0083, 2002 WL 737074, at *5 (Ohio Ct. App. Apr. 26, 2002).  The Eleventh District Court's decision is not an unreasonable application of *Brady*.  This claim lacks merit.

**3. Twenty-Third Ground for Relief**

Jones argues that the prosecution failed to furnish him with information that the murder weapon was found near Officer Jones's body, rather than near the site of his arrest.  To support this allegation during post-conviction proceedings, Jones offered the affidavit of Roger Perry, who stated that he overheard unidentified police officers discussing the murder weapon location.  The Eleventh District Court of Appeals found this claim to be without merit.  It held that the State "is not deemed to have constructive knowledge of everything that every unidentified police officer may have to say about the investigation."  *State v. Jones*, 2002 WL at *6.  It concluded that because there is no indication that the Ashtabula Police Department ever concluded that the gun was found near Officer Glover's body, no *Brady* violation occurred.

This holding is not an unreasonable application of *Brady* and its progeny.  While a prosecutor is presumed to have knowledge of all information gathered in the possession of others acting on the government's behalf, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998), it cannot possibly know about every informal

-87-

discussion that takes place among law enforcement personnel.  Moreover, as the Eleventh District concluded, there is no basis to believe that the statements of one police officer represent the conclusions of the murder investigation.  Thus, this claim is not well-taken.

### L. Twenty-Fifth Ground for Relief - Competency

Jones claims that the trial court erred when it failed to *sua sponte* order a competency hearing.  He contends that an outburst he had during a pre-trial hearing and the fact that he did not trust his attorneys should have alerted the trial court that a competency hearing was necessary.  Jones did not raise this claim on direct appeal.  Instead, he raised it during post-conviction proceedings.  The Eleventh District Court of Appeals held that because Jones could have raised the claim on direct appeal, it was barred by res judicata.  The claim is therefore procedurally defaulted.

It is without merit in any event.  The United States Supreme Court has long recognized that the criminal trial of an incompetent defendant violates due process.  *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 385-86 (1966)(holding due process violation applicable to state trials through Fourteenth Amendment).  To determine if a criminal defendant is competent to stand trial, a trial court must determine "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).

Here, the only indication of incompetency Jones asserts should have alerted the trial court is a brief outburst that occurred during a pre-trial hearing.[27]  Additionally, Jones asserts that the

---

[27]

(continued...)

distrust he harbored towards his lawyers shows sufficient indicia of his incompetency to warrant an evaluation.  The Court finds the alleged indicia are insufficient to hold that the trial court committed constitutional error.  The bond hearing outburst appears to be limited to a single comment that did not pervade the entire hearing.  Moreover, as reviewed above, the trial court did not err in requiring appointed counsel to stay on the case.  Jones's distrust of appointed counsel because he did not agree with the focus of the trial does not render him unable to consult with them or to understand the trial proceedings.  This claim lacks merit.

### M. Twenty-Seventh Ground for Relief - Alternate Jurors in Deliberations

Jones alleges that the trial court's decision to permit the alternate jurors to sit in on the jury deliberations constitutes error requiring habeas relief.  He did not raise this claim at any point in his state court proceedings.  Thus, the claim is defaulted and the Court will not address it on the merits.[28]

### N. Twenty-Eighth Ground for Relief - Ohio's Post-Conviction Procedure

Jones claims that Ohio's post-conviction system is unconstitutional because it denies its petitioners the ability to obtain discovery as other civil litigants do.  He argues that this violates

---

[27](...continued)
At this bond hearing, Jones was not represented by counsel.  When the trial court stated that it was attempting to procure counsel for Jones but was nevertheless accepting the State's motion to deny bond, Jones reacted by saying, "I would like to say this is real fucked up how you got me representing myself."  (Doc. No. 29, Tab A, at 11).  Other than this brief disturbance, Jones did not behave inappropriately.

[28]

Were it properly preserved for federal habeas review, this claim would not be well-taken.  In *United States v. Olano*, 507 U.S. 725 (1993), the United States Supreme Court held that no structural error occurred where alternate jurors were permitted to be present but not participate in jury deliberations.  Here, the trial court admonished the alternate jurors not to participate "in any fashion whatsoever, in the jury deliberations."  (Doc. No. 45, at 3116).  Pursuant to the *Olano* holding, this claim lacks merit.

the Equal Protection Clause of the United States Constitution.  Jones raised this ground for relief on direct appeal from his denial of post-conviction relief.  Thus, the claim is not defaulted.

The Court declines to consider this argument, however, because Jones fails to articulate any infringement for which a federal habeas corpus court can grant relief.  The Sixth Circuit has held that, "habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings."  *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001)(citing *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986)).  As the *Greer* court observed, the United States Supreme Court has determined that states have no constitutional obligation to provide post-conviction remedies.  *Id.* (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)).

**O. Thirty-Second Ground for Relief - Jones not Present During Critical Phases of Trial**

Jones contends in this ground that he was denied the right to be present during critical phases of his trial.  He asserts that because he was not present during some pre-trial hearings, sidebar conferences, and a hearing in which counsel discussed Jones's desire to obtain new counsel, he should be afforded habeas relief.  Jones failed to raise this claim on direct appeal or during post-conviction relief proceedings.  He raised it for the first time in his second application to reopen his direct appeal.  This claim is therefore procedurally defaulted and the Court will not review it on the merits.

This claim would not be well-taken in any event.  In *United States v. Gagnon*, 470 U.S. 522 (1985), the United States Supreme Court held that

> [a] criminal defendant has the right to be present at any proceeding whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

*Id.* at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934))(internal quotation marks omitted).  If a federal habeas court determines that error occurred and the defendant was excluded from a critical phase of the trial, the court must then determine whether such error was harmless or prejudicial to the defendant.  *Rushen v. Spain*, 464 U.S. 114, 119-20 (1983).

The Court finds that none of the points at which Jones was absent were critical in nature.  While Jones maintains that he should have been present when counsel discussed Jones's choice of counsel with the court, the court held a hearing on the day prior to this conference in which Jones was invited to participate.  Jones provided his opinion on his choice of counsel at that point.  This claim is without merit.

## P. Thirty-Third Ground for Relief - Victim Impact Testimony

Finally, Jones argues that the trial court permitted victim-impact testimony from the prosecution and several State witnesses.  He claims that the prosecutor mentioned Officer Glover's wife and children in opening and closing arguments.  He also asserts that Barksdale provided improper testimony when he stated that Officer Glover was a good cop.  Finally, he asserts that two other witnesses testified regarding the events that occurred with Officer Glover's wife when he was receiving medical treatment after the shooting.  As with the previous claim, Jones first raised this claim in his second application to reopen his direct appeal.  Thus, it is procedurally defaulted.

It also lacks merit. The United States Supreme Court has held that "there is no *per se* bar to the introduction of victim impact evidence and argument" and that, in the majority of cases, such evidence serves entirely legitimate purposes.  *Cooey v. Coyle*, 289 F.3d 882, 921 (6th Cir. 2002)(citing *Payne v. Tennessee*, 501 U.S. 808, 825-27 (1991)).  Victim-impact evidence will not

-91-

serve as a basis for habeas relief unless the petitioner can show that the evidence was so unduly prejudicial, it rendered the trial fundamentally unfair. *Payne*, 501 U.S. at 825. "While *Payne* was announced in the context of the sentencing phase of a capital trial, its rationale has been applied to reject challenges to victim impact evidence introduced in the guilt phase as well." *Cooey*, 289 F.3d at 921 (citing *Black v. Collins*, 962 F.2d 394, 408 (5th Cir.1992))(citations omitted).

Here, Jones complains that the prosecutor referred to Officer Glover's family and that several State witnesses made isolated comments regarding the victim or the events that occurred around his impending death. These sporadic comments do not render Jones's trial fundamentally unfair.

## IX. CONCLUSION

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Jones's grounds for relief. The Sixth Circuit Court of Appeals has determined neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Jones presented in his Petition and Amended Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the
> detention complained of arises out of process issued by a State court
> . . .
> (2) A certificate of appealability may issue under paragraph (1) only if the
> applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate

he was denied a *constitutional* right, rather than the federal right that was required prior to the

AEDPA's enactment.

    The United States Supreme Court interpreted the significance of the revision between the

pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that

case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v.*

*Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in

the statute.  *Id.* at 483.   Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial
> showing of the denial of a constitutional right, a demonstration that, under
> *Barefoot*, includes showing that reasonable jurists could debate whether (or, for
> that matter, agree that) the petition should have been resolved in a different manner
> or that the issues presented were "'adequate to deserve encouragement to proceed
> further.'"

*Id*. at 483–04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

    The Court went on to distinguish the analysis a habeas court must perform depending upon

its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted,

then a habeas court need only determine whether reasonable jurists would find the district court's

decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however,

when assessing whether to grant a COA for a claim the district court has determined is

-93-

procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  (emphasis supplied).

After taking the above standard into consideration, the Court finds as follows.  The Court will not grant a COA for grounds 2 and 27 because they were never raised at any point in Jones's state court appeals.  They are therefore unequivocally procedurally defaulted.  Also defaulted are grounds 10, 12, and 13(a) as defense counsel did not contemporaneously object and the Ohio Supreme Court conducted a plain error review of these claims.  Because Jones raised grounds for relief 22, 24, 25, and 26 for the first time in post-conviction relief proceedings and the Eleventh District Court of Appeals refused to review them on the merits, finding that they were barred by res judicata, these grounds for relief are unequivocally procedurally defaulted and thus ineligible for a COA.  Jones raised grounds for relief 31, 32, and 33 for the first time in his second application to reopen his direct appeal.  No jurist of reason would find the defaulted status of these grounds for relief to be debatable.  No COA will issue for these grounds.

Equally unworthy of a COA are grounds for relief 8, 14(b), 14(d)-(g), 28, and 34.  These grounds for relief are either not cognizable in a habeas proceeding, too vague to be addressed by this Court, or Jones has not shown sufficient prejudice to warrant habeas relief.  No jurist of reason would debate these findings.

Reasonable jurists would not debate the Court's findings regarding Jones's first ground for relief (trial court limited counsel's ability to ask questions about mitigating factors).  No reasonable jurist would conclude that the Ohio Supreme Court's decision finding that the trial

-94-

court complied with the dictates of *Morgan v. Illinois* when it questioned each prospective juror about his or her ability to follow the law was unreasonable.  No COA will issue for this claim.

Similarly, the Court finds that jurists of reason would not debate the Court's decision to deny relief for grounds 3 and 15 (trial court improperly weighed aggravating circumstances and mitigating factors).  Not only were the trial court's sentencing findings supported by the trial record, it is questionable whether this Court may re-weigh a state court's sentencing findings.  The Court will not grant a COA for these grounds.

The Court grants a COA for ground for relief 4 (acquittal-first instruction).  While the Court found that the trial court's sentencing instruction was not tantamount to an acquittal-first instruction, a reasonable jurist could conclude that because the trial court did not use the specific language provided in *State v. Brooks*, the jury may not have understood that if only one of its members felt death was not appropriate, it could not impose the death penalty.

Conversely, no jurist of reason would debate this Court's finding that ground 5 (prosecutor's use of peremptory challenges to excuse jurors), lacks merit.  The Ohio Supreme Court's determination that the prosecution may use peremptory challenges to excuse jurors with reservations about imposing the death penalty is supported by the record as proscribed by *Wainwright v. Witt*, 469 U.S. 412, 434 (1985).  Reasonable jurists would agree.

No reasonable jurist would find equivocal this Court's decision to deny relief for ground 6 (racial composition of the jury).  As the Ohio Supreme Court observed, voter registration lists are not an inherently discriminatory way of obtaining a venire.  Because Jones's venire was obtained using this method, in compliance with *Duren v. Missouri*, 439 U.S. 357, 367-68 (1979), the Court's finding that the Ohio Supreme Court reasonably applied the *Duren* test is not debatable

among jurists of reason. No COA will issue for this ground.

The Court grants a COA for grounds 7 and 21 (Jones's relationship with defense counsel). Although the Court found that the Sixth Circuit's test articulated in *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007), showed that Jones did not set forth sufficient "good cause" for the trial court to remove defense counsel, other jurists could find that because Jones stated on the record that he did not trust his attorneys, the trial court should have permitted Per Due to represent him.

A COA will not issue for grounds 9 and 30 (sufficiency of the evidence). As the Ohio Supreme Court found, there was more than ample evidence to support Jones's conviction for the murder of Officer Glover. No jurist of reason would debate this Court's conclusion.

Equally undebatable is the Court's decision to deny Jones relief for ground 11 (failure to merge aggravating factors). As the Ohio Supreme Court found, each aggravating factor arose from a distinct course of conduct. Thus, the trial court did not err in failing to merge the aggravating factors. No COA will issue for this claim.

The Court also will not issue a COA for ground 13(b) (trial court's penalty phase instruction regarding sympathy). Like the instruction in *California v. Brown*, 479 U.S. 538 (1987), the trial court's instruction here did not mislead the jury. Jurists of reason would agree.

No jurist of reason would debate that ground for relief 14(a)(ineffective assistance of counsel for failure to request Juror McCollum be removed for cause) is without merit. As the Ohio Supreme Court observed, Jones cannot demonstrate that he was prejudiced by counsel's use of a peremptory challenge to excuse this juror. Jones also cannot demonstrate that counsel were unreasonable or that they prejudiced the outcome of the proceeding by failing to request a merger

-96-

of the aggravating factors until the penalty phase of the trial as alleged in ground for relief 14(c).
As stated above, the jury considered only two aggravating factors in its penalty phase
deliberations.  No jurist of reason would disagree with this Court's findings on this issue.

The Court grants a COA as to grounds for relief 14(h) and 18 (ineffective assistance of
counsel for failure to investigate and present mitigating testimony).  This issue has been one
subject to much debate in the Sixth Circuit.  Thus, while this Court found that counsel presented
nearly all of the mitigation testimony Jones alleges was excluded, a reasonable jurist could find
that counsel's mitigation presentation was lacking and that it prejudiced the outcome of that
proceeding.

The Court will not issue a COA for ground 16 (unconstitutionality of the death penalty).
These claims occur almost *pro forma* in capital habeas petitions but are routinely denied.
Reasonable jurists would agree with this finding.

No jurist of reason would find grounds 17 , 20, and 29 (ineffective assistance of counsel
for failure to learn about Barksdale deal with State and *Brady* claim for failing to disclose deal),
have merit.  As stated above, these grounds for relief are unsupported by the record.  Reasonable
jurists would agree.

Finally, no COA will issue for ground 19 (prosecution failed to turn over pictures of
Jones's head injury).  The Court held that the Eleventh District Court of Appeals' decision
determining that the photographs would have been cumulative of other testimony presented during
trial was reasonable and that the claim did not warrant habeas relief.  This finding is unequivocal.

For the foregoing reasons, the Petition and Amended Petition for relief pursuant to 28
U.S.C. § 2254 are denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal

from this decision could be taken in good faith as to grounds 4, 7, 14(h), 18, and 21, and the Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.R.App.P. 22(b) as to those grounds only.  As to all remaining grounds, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed.R.App.P. 22(b).

     IT IS SO ORDERED.

                                        *s/ David A. Katz*
                                        DAVID A. KATZ
                                        U. S. DISTRICT JUDGE