## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ODRAYE G. JONES | ) | |
| n/k/a MALIK ALLAH-U-AKBAR, | ) | Case No. 1:03-cv-01192 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MARGARET BRADSHAW, | ) | **CAPITAL CASE** |
| Respondent. | ) | |

_____

## MOTION TO ISSUE UNCONDITIONAL WRIT OF HABEAS CORPUS AND BAR RETRIAL

_____

Malik Allah-U-Akbar, through undersigned counsel, respectfully asks this Court to immediately issue an unconditional writ of habeas corpus ordering the State of Ohio to vacate Mr. Akbar's death sentence. Mr. Akbar further requests that this Court impose sanctions. Because the proceedings thus far have demonstrated the State of Ohio's continued inability to provide Mr. Akbar with a constitutionally compliant penalty phase, this Court should bar the retrial or, at a minimum, bar the State's continued pursuit of the death penalty.

1

Habeas courts have broad discretion to fashion a proper remedy in the face of a constitutional violation, including the discretion to bar the state from reprosecuting the habeas petitioner in extraordinary circumstances. *D'Ambrosio v. Bagley*, 656 F.3d 379, 385 (6th Cir. 2011) (citing *Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 (6th Cir. 2006)).  In a typical case where a petitioner must be released because the state fails to comply with the order granting the conditional writ, the state can rearrest and retry the petitioner under the same indictment. *Satterlee*, 453 F.3d at 370. "However, in 'extraordinary circumstances,' such as when 'the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial,' a habeas court may 'forbid[] reprosecution.'" *Id.* (citations omitted). Mr. Akbar's case presents these extraordinary circumstances.

### A. Because the State of Ohio has failed to comply with the conditional writ within the time set by the mandate, an unconditional writ of habeas corpus must issue.

In this case, the Court of Appeals for the Sixth Circuit unanimously found that Mr. Akbar's first capital sentencing proceeding over 25 years ago was infected by constitutionally intolerable racism. *Jones v.*

*Bradshaw*, 46 F.4th 459, 489 (6th Cir. 2022). The Court remanded Mr. Akbar's case to the district court with instructions to issue a conditional writ of habeas corpus vacating his death sentence unless the State of Ohio conducted a new penalty-phase proceeding within 180 days of remand. *Id.* With the conditional writ, the Court gave Ohio an opportunity "to replace an invalid judgment with a valid one." *Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005).)

A mandate requiring that a retrial be "conducted" means that the State must *complete* it within the 180 days, not simply grant it. *See D'Ambrosio*, 656 F.3d at 385. The 180-day mandate in this matter began to run on November 17, 2022. On April 7, 2023, 141 days into the mandate period, the Warden asked the Court of Appeals for the Sixth Circuit to be excused from the strictures of its mandate, arguing that "[i]t is manifest that the State has complied with the conditional writ." *See* Case No. 07-3766, Doc. 333-1 at 3.[1] In an opinion, the Court of Appeals denied the Warden's Motion, first noting that "there is no indication that

---

[1] All "Doc." citations herein refer to federal appellate docket No. 07-3766. All "CCP" citations refer to Ashtabula County Court of Common Pleas Docket No. 97-221. Counsel will submit copies of any docket entries or transcripts upon the Court's request.

the state court has vacated [Akbar]'s death sentence." Doc. 335-1 at 4. The Court was clear that the "the State has not yet satisfied the imposed obligation or demonstrated substantial compliance." *Id.*

The next day, with only five days remaining until the mandate deadline, the Warden requested an extension of 190 days. The Court of Appeals granted the request, more than doubling the time for the State to fulfill its obligations under the conditional writ. *See* Doc. 339-1 (setting November 22, 2023, as the new date of compliance).

On October 24, 2023, the Warden returned to the Court of Appeals, this time requesting an additional 248 days within which to comply with the conditional writ. Doc. 349-1. For multiple reasons outlined in his Response, Mr. Akbar opposed the grant of additional time. Doc. 351. The Court of Appeals denied the Warden's motion. Doc. 352. Without another word from the State of Ohio – either in state or federal court – the mandate period expired on Wednesday, November 22, 2023.

The "fundamental question for a district court when considering whether the conditional writ has been complied with is whether the state has fully vindicated the prisoner's rights." *D'Ambrosio,* 656 F.3d at 391 (Boggs, J., dissenting). "Indeed, what an unconditional writ

4

accomplishes—release from unconstitutional custody—is precisely what a conditional writ encourages the state to accomplish on its own." *Id*. It is beyond any reasonable debate that Mr. Akbar remains under an unconstitutional sentence of death and that the State of Ohio has failed to conduct a new penalty phase trial. Because the mandate period has expired and Ohio has not demonstrated any degree of compliance with the conditional writ, an unconditional writ ordering the State to vacate Mr. Akbar's death sentence must issue.[2]

> **B. The State of Ohio has demonstrated a continued inability to provide Mr. Akbar with a constitutionally compliant capital sentencing hearing.**

As in *D'Ambrosio*, "[f]or more than twenty years, the State of Ohio has displayed a remarkable inability to competently prosecute" Mr. Akbar. Racist arguments and testimony in the 1998 penalty phase from the prosecutor, the lawyer it assigned to Mr. Akbar, and defense psychologist Dr. James Eisenberg, came "back to bite it in federal habeas review." 656 F.3d at 390-91 (Boggs, dissenting on other grounds). And, as in

---

[2] The unconditional writ should not surprise the State, as the trial court ordered the parties to submit briefing on the consequences of non-compliance with the Sixth Circuit's mandate over seven months ago. *See* CCP 4/7/23 Parties' Briefs Concerning the Conditional Writ's Operation.

*D'Ambrosio*, the "hapless" State of Ohio now has bungled a clear conditional writ and "has asserted a variety of confused jurisdictional arguments" in multiple courts. *Id.* As undersigned counsel has briefed in the Court of Appeals across multiple filings, the state court proceedings during the last calendar year have been a veritable circus.[3] The following is a non-exhaustive list of the due process minefield Mr. Akbar has endured since the conditional writ issued:

*Unexplained Judicial Recusals and Presentment Delay*

   o  Mr. Akbar was not brought before the trial court until January 27, 2023, after 66 days of the mandate period had elapsed.

   o  The first two state court judges to whom Mr. Akbar's retrial was assigned both recused themselves. The first judge, Judge Sezon, waited nearly a month after the mandate issued until December 20, 2022, to recuse. She did not provide a reason for her recusal and had already issued orders in the case.

---

[3]  *See* Doc. 334 (Response to the Warden's Motion for a Determination that the State has Complied with the Conditional Writ); Doc. 344 (Motion to Reconsider); Doc. 351 (Appellant's Response in Opposition to Warden's Motion for a Second Extension of Time to Comply with the Conditional Writ).

o The case was re-assigned to Judge Harris on January 3, 2023. Judge Harris recused himself that same day. Like Judge Sezon, he did not provide the basis for his recusal.

o On January 3, 2023, Mr. Akbar's case was again re-assigned, this time to Judge Schroeder, the only remaining judge on the Court of Common Pleas for Ashtabula County. Judge Schroder did not hold an initial status conference in the case until more than three weeks later. *See* CCP 3/30/202 Order (Judge Schroeder acknowledging the considerable passage of time until the first status conference was held).

*Faretta Delays*

o As early as December 20, 2022, Mr. Akbar—via written motion—expressly objected to the appointment of counsel and invoked his right to self-representation.[4]

o On January 3, 2023, just days after meeting Mr. Akbar for the first time at the Ohio State Penitentiary, court-appointed

---

[4] Counsel was appointed via written order on December 2, 2023, as part of the State's request to reactivate the case. At the time, Mr. Akbar still was imprisoned on death row at the Chillicothe Correctional Institution and received the news of the appointment of counsel by mail on an unknown date sometime after the order was issued.

counsel filed a Notification of Defendant's Assertion of Right of Self-Representation, confirming Mr. Akbar's firm desire to represent himself and requesting that the state court hold a *Faretta* hearing as soon as possible.

o The state court did not hold the *Faretta* hearing until September 29, 2023, and did not rule on Mr. Akbar's request to represent himself until October 5, 2023. *See, e.g.,* 10/6/23 Tr. at 45 (Mr. Akbar stating that the granting of his *Faretta* motion "with less than a month to go…irreparably prejudices my defense. But I'm not going to ask for no continuance because that was not of my doing. That's – you know, that's you-alls doing.").

o Even though competency and *Faretta* determinations were pending during this period and Mr. Akbar was largely non-communicative with appointed counsel,[5] the state court proceeded to adjudicate issues critical to Mr. Akbar's penalty

---

[5] The state court record contains ample memorialization of Mr. Akbar's insistence that he would not work with appointed counsel. *See, e.g.* CCP 7/19/23 Motion for Extension of Time (appointed counsel requesting that the court waive the client endorsement provision where "Defendant will barely speak with counsel at all").

phase retrial without his input and/or against his stated position. *See*, *e.g.* Tr. 2/14/23 at 20-25 (Mr. Akbar stating to the court that he would stipulate to the state's motion to vacate the 1998 sentencing judgment entry even though his appointed counsel was opposing the motion); CCP 2/17/23 Judgment Entry (opinion denying the state's motion to vacate); CCP 8/15/23 (Parties Stipulation as to the Juror Questionnaire to be Mailed Out); Tr. 3/13/23 at 73 (Mr. Akbar reminding the court "I haven't submitted jury questionnaires" and the court ignoring him and ordering the parties to confer on duplicate questions)[6]; Tr. 10/6/23 at 44-73 & CCP Judgment Entry 10/6/23 (trial court

---

[6] Mr. Akbar is a dark-skinned, African American man. He was sentenced to death by an all-white jury for the killing of a white police officer in a county whose residents are over 94% white. That jury heard uncorrected, unconstitutional testimony that Mr. Akbar was more likely to be dangerous in the future because of his race. The Court of Appeals reversed on that ground. Mr. Akbar's judges, lawyers, prosecutors, and evaluators in the state court retrial proceedings thus far all have been white. There is no information on the state court record available to undersigned counsel that indicates whether the disseminated juror questionnaires included sufficient questions concerning race to ensure Mr. Akbar's rights to a fair and impartial jury. Nor has the trial judge addressed whether new questionnaires will be formulated, and a new panel summoned now that Mr. Akbar is representing himself.

9

continuing the retrial date over Mr. Akbar's express objection that he did not want a continuance).[7]

o   After competency evaluations were ordered, appointed counsel filed a Motion for Change of Venue. CCP 3/27/23 Motion. No ruling on this Motion appears on the docket or in the state court transcripts; however, by summoning the jury panel in August, the trial court *de facto* denied this substantive motion before granting Mr. Akbar the right to represent himself in October. *See* CCP 8/14/23 (state court order summoning jury panel); Tr. 10/6/23 at 44 (trial court noting that potential capital jurors' questionnaires already had been returned).

o   In an affidavit, the state's prosecutor has declared that by "allowing the proceedings to move forward with court-appointed

---

[7] At all times before the state trial court, Mr. Akbar has objected to continuances of his capital resentencing proceeding. *See, e.g.,* CCP 2/16/23 Pro Se Filing; CCP Tr. 3/13/23 (Status Conference); 3/14/23 Pro Se Motion for Relief from Judgment (CA6); CCP Tr. 3/31/23 (Status Conference); CCP Tr. 9/29/23 at 4 (*Faretta* hearing); CCP Tr. 10/6/23 (Status Conference); CCP Tr. 11/1/23 at 45 (Status Conference).

counsel over the defendant's objections," the trial judge has created "structural error" in Mr. Akbar's retrial proceedings.[8]

*Court-appointed Competency Expert Relies on Dr. Eisenberg*

o On February 1, 2023, the state court ordered Mr. Akbar to undergo a competency evaluation by the local Forensic Psychiatric Center of Northeast Ohio, Inc., and further ordered that "Defense Counsel and the Prosecuting Attorneys shall provide the Forensic Center with all necessary collateral information needed to conduct the evaluation…including mental health, medical, and educational reports as well as reports conducted in prior legal proceedings such as past competency evaluations."

o At no point did the state's attorney or appointed counsel object to the court's order or remind Judge Schroeder about the basis of the penalty phase relief ordered by the Court of Appeals.

---

[8] The Ohio Supreme Court held that because the prosecutor's allegation amounted to a claim of legal error, it was non-cognizable in judicial disqualification proceedings. The Court declined to address its merits. *See In re Disqualification of Schroeder,* 2023-Ohio-3171.

11

o On February 15, 2023, Dr. Hart, a local psychologist, interviewed Mr. Akbar for competency purposes for approximately 80 minutes. Mr. Akbar did not sign the Informed Participation Form because the jail did not allow the evaluator to bring a pen and because Mr. Akbar was front cuffed to his waist chain during the interview. Dr. Hart performed no testing.

o In a report dated February 18, 2023, Dr. Hart opined that Mr. Akbar was competent to represent himself. In a later-dated report of March 2, 2023, she found Mr. Akbar to be competent to stand trial. Dr. Hart proffered a single diagnosis: Antisocial Personality Disorder. Both of Dr. Hart's reports were twelve pages long; her first report referenced the 1998 psychological report of Dr. James Eisenberg over eleven times, and the second report invoked Dr. Eisenberg's report ten separate times.

o Nowhere in either report does Dr. Hart demonstrate any appreciation of why Mr. Akbar's case was remanded or any understanding that Dr. Eisenberg's expert testimony concerning Mr. Akbar's psychiatric diagnosis of Antisocial Personality Disorder was held to be "racist" and unconstitutional.

o  At the September competency hearing, Dr. Hart testified that she received the expert reports from trial, including Dr. Eisenberg's psychological report, and other materials from the state's prosecutor. *See* Tr. 9/8/23 at 27.

o  As her reports clearly reflect, Dr. Hart testified that she relied on Dr. Eisenberg's findings and report in forming her expert opinions of Mr. Akbar. Tr. 9/8/23 at 36; *see also id.* at 41-42 ("I got more out of the typed reports of Dr. [John] Kenny and Dr. Eisenberg" than the "largely illegible" medical records).

o  Though the prosecution supplied the competency evaluator with Dr. Eisenberg's report, Dr. Hart never received the report of Dr. Hugh Turner, the African American clinical psychologist who evaluated Mr. Akbar on four separate occasions during his state post-conviction proceedings—the same Dr. Turner upon whose report the Court of Appeals for the Sixth Circuit relied in unanimously overturning Mr. Akbar's death sentence. *See* Tr. 9/8/23 at 42.

o  At no point during the competency proceedings did the state court, the state's prosecutor, or the appointed defense attorneys

13

acknowledge or object to the problematic importation of Dr. Eisenberg's work product and ASPD diagnosis into Mr. Akbar's constitutionally mandated retrial.

o At no point during competency proceedings did the state court, state's prosecutor or appointed attorneys acknowledge or object to the exclusion of Dr. Turner's expert report, which, as the Court of Appeals found, did not turn on Mr. Akbar's race, opined that Dr. Eisenberg's diagnosis of ASPD was incorrect, and reached different psychiatric diagnoses, including a primary diagnosis of PTSD. *See* 46 F.4th at 486-487. [9]

---

[9] Undersigned counsel briefed and argued claims involving these prior mental health experts for several years before the Court of Appeals. Counsel's review of Dr. Hart's reports and the September 2023 competency hearing transcript show that Dr. Hart's opinions are replete with factual errors and based on very limited information. In particular, the ASPD diagnosis—the only diagnosis Dr. Hart rendered—suffers from the same diagnostic invalidity as Dr. Eisenberg's diagnosis, on which Dr. Hart expressly relied. *See, e.g.* Doc. 302 at 47-56 (explaining why Mr. Akbar does not meet the DSM-IV diagnostic criteria required for an ASPD diagnosis); Doc. 233 at 57-58 (same). Though the competency hearing did not occur until a full ten months after the mandate issued, the transcript does not reflect that the state court, its prosecutor, or appointed counsel are familiar with—let alone fluent in—Mr. Akbar's federal proceedings.

14

- o Dr. Hart testified that although she knew of Mr. Akbar's traumatic brain injury from Dr. Kenny's trial report, she did not talk to Mr. Akbar about it. *Id.* at 34. When pressed about the neuroprocessing deficits Dr. Kenny flagged in 1998, Dr. Hart testified that she "would recommend further more recent neurological testing for that, 'cause this case is over almost 20 years ago." *Id.* at 63-64. Dr. Hart then admitted that the results of updated neuropsych testing, particularly "how much or severe or the extent" of any delays, would affect her opinion as to Mr. Akbar's competency to represent himself.[10]

- o Dr. Hart's report also demonstrates that she had no working understanding of the differences between a penalty phase retrial as opposed to an actual trial when evaluating Mr. Akbar's ability to "construct a legally logical defense and to make arguments in

---

[10] Despite this testimony from Dr. Hart (and Mr. Akbar's documented life-flight, surgery and ICU stay after a claw hammer attack to his skull), neither party nor the court requested that neuropsychological testing be performed. Rather, at the close of the competency hearing, the state court denied appointed counsel's request for an African American clinical psychologist to re-assess Mr. Akbar, citing the court's "timeline" to comply with the mandate. *See id.* at 14.

support of his position." *See* CCP 9/8/23 Hearing Exhibit (Dr. Hart Report 2/18/23 at 10) (Dr. Hart noting that Mr. Akbar discussed his right to "Brady evidence," his "charges and the legalities of the wording of his charges and his indictment," and "previous false testimony" and admitting she was "not in a position to judge the legal nature of his arguments.") Other evidence in the record demonstrates the trial court's persistent concerns about Mr. Akbar's misunderstanding of the contours of a penalty phase retrial. *See also* Tr. 10/6/23 at at 7 (Mr. Akbar objecting to the waiver of counsel form: "all of this conditions you talking about in points 8[11] and point 9 so far, that ain't necessary in no waiver of counsel."); *id.* at 8 (the Court: "Paragraph 8 is entirely factually accurate"); *id.* at 23 (Mr. Akbar arguing with the court that "there is no procedural history" because "whatever takes place after a void judgment is void itself."); 10/6/23 at 59 (trial court still attempting to preempt Mr. Akbar from making arguments beyond the scope of the penalty phase).

---

[11] "Point 8" in the waiver of counsel form drawn up by the trial court stated that the Court of Appeals "has not reversed my case for the guilt phase, and that the guilty verdict rendered by a jury is still valid today."

16

- o Despite the Dr. Hart's extensive diagnostic reliance on the very same psychologist who was disgraced in federal habeas proceedings and the other deficiencies in her evaluation as described above, the state court fully adopted Dr. Hart's opinions.[12]

- o The state court also credited the "unwavering" opinion of a second court-appointed psychologist, Dr. Kevin Edwards, notwithstanding that Dr. Edwards never evaluated Mr. Akbar at all. *See* 9/8/23 Tr. at 86 (once Mr. Akbar told him to "get the fuck out of here", Dr. Edwards left without evaluating him); CCP 9/12/23 Judgment Entry (court finding Dr. Edwards' "testimony and conclusions to be reliable and credible").

*Faretta Request is Granted*

- o On September 29, 2023, the trial court held a *Faretta* hearing. When the court asked Mr. Akbar what the scheduled proceeding

---

[12] Mr. Akbar has a right to self-representation. However, he is equally entitled to the due process protections the Constitution requires to ensure any waiver he makes is knowing and intelligent. Transposing the same constitutional error that occurred in his first capital sentencing proceeding onto his retrial does not satisfy due process.

17

"is going to be", Mr. Akbar responded, "Well, under the legal fiction that's presented, the legal posture is that it's a resentencing." Tr. 9/29/23 at 5.

o When asked if he would contest the original underlying sentencing conviction in his resentencing hearing, Mr. Akbar responded "there is no conviction." Tr. 9/29/23 at 8. *See also id.* at 8-9 (Mr. Akbar answering "yes" that he disputes "the fact that there was a conviction"; *id.* at 18 ("I have not been convicted…By operation of law I haven't"); *id.* at 20 ("Q: Do you understand that the verdict, the conviction in this matter still stands? A. No. Q. You do not understand that? A. There was never a conviction.")

o Mr. Akbar told the court it was "legally impossible" for the jury to reimpose the death penalty in this matter. *Id.* at 20.

o Mr. Akbar also told the court that because "all the guys I seen on death row" were not successful in presenting mitigation about their "bad childhood[s]", "that's not a viable strategy for me and I'm not presenting that. That's worthless." *Id.* at 31. The trial

court did not remind Mr. Akbar of the capital defendants across Ohio and the country who have been spared on these grounds. [13]

o   When the trial court asked Mr. Akbar for the holding of *Morgan v. Illinois*, Mr. Akbar responded: "Per se I couldn't say. It's about – something about counsel, I would believe." The court replied, "No. It actually has to do with jury selection." 9/29/23 at 55. The court immediately moved to another question. *Id.* This was the only time the trial court even hinted at the specialized nature of capital voir dire during its questioning.

o   Mr. Akbar stated he would not utilize standby counsel for any purpose and objected to their appointment. "I don't need no lawyer. Period." *Id.* at 64.

---

[13] Mr. Akbar's mother was a teenager in Ohio's foster care system when she had him. Her own mother was shot to death in a motel room when she was a child. Mr. Akbar grew up at his mother's group home, where their sole foster parent worked nights. As an infant, Mr. Akbar was neglected and malnourished. As a child, he often walked himself to the emergency room when he needed care. His mother, with whom he maintained a fractured relationship due to her struggles with addiction and incarcerations, committed suicide when he was thirteen. Months earlier, Mr. Akbar had visited her in a psychiatric ward, where she was experiencing hallucinations. Only after his mother's death did Mr. Akbar learn the identity of his father. *See* Doc. 233 at 51-76 (describing the ineffective mitigation presentation at Mr. Akbar's initial sentencing.)

- o Mr. Akbar stated that he did not need a mitigation specialist. "I'm not going to sign nothing, you know what I'm saying. I don't need them. I know what I'm presenting." *Id.* at 80.

- o The trial court granted Mr. Akbar's request to represent himself. CCP 10/5/23 Judgment Entry.

- o To date, the trial court has not adjudicated the specification-related jurisdictional challenges Mr. Akbar raised in *pro se* pleadings as early as December 2022, even though the trial judge previously deferred rulings on those motions.

- o There is no indication on the state court record that Mr. Akbar, since the granting of his right to represent himself, has been permitted to have uncuffed hands in court while seated at counsel table.

*Delays Attributable to Judicial Disqualification Proceedings*

- o Mr. Akbar's competency and *Faretta* proceedings were delayed for almost three additional months because the state prosecutor initiated judicial disqualification proceedings against the only remaining trial judge in Ashtabula County during the initial mandate period. *In re Disqualification of Schroeder*, 2023-Ohio-

3171 (noting that Judge Schroeder postponed the competency proceedings after Prosecutor O'Toole filed an affidavit to disqualify him).

o The first time the prosecutor filed an affidavit of disqualification, she failed to comply with statutory time limits. *In re Disqualification of Schroeder*, 2023-Ohio-3171 (discussing dismissal of O'Toole's April 10th affidavit of disqualification).

o A total of five status conferences were held before Prosecutor O'Toole filed to disqualify Judge Schroeder. She had only been present for two of them.

o Nearly a month later, on May 5, 2023, the prosecutor filed a second affidavit of disqualification, which was not made public until the Supreme Court of Ohio dismissed the prosecutor's allegations on July 7, 2023. *In re Disqualification of Schroeder*, 2023-Ohio-3171 (directing the clerk to unseal the affidavit of disqualification).

o When an affidavit of judicial disqualification is filed in Ohio, all proceedings must cease until the Supreme Court of Ohio has ruled upon it. With the two affidavits of disqualification filed by

21

O'Toole, nothing could progress from April 10 to July 7.  As a result, the May 15, 2023, competency hearing was cancelled.

o In its opinion, the Supreme Court of Ohio described the prosecutor's extreme allegations that the trial judge was "unhinged", including:

- o "O'Toole alleges that Judge Schroeder is "obsessed" with the Sixth Circuit's 180-day mandate and that "multiple times on the record in the public square [he has] accused [her] of a host of ethical issues" relating to the best way to seek an extension from the Sixth Circuit. According to O'Toole, the judge wrongly believed that the state of Ohio had the responsibility to seek the extension. She also asserts that the judge's "constant berating" of her resulted in the victim's family questioning her competency and that the judge's facial expressions show his "serious bias" against the prosecution."

- o "O'Toole alleges that Judge Schroeder has conducted his own independent investigation to determine whether she or anyone from her office violated the court's gag order. Specifically, she alleges that during the February 14 and March 13 status conferences, the judge "aggressive[ly]" questioned her and attorneys from her office about various newspaper articles and accused her of livestreaming a prior status conference. The judge, O'Toole claims, made an assumption that she spoke to the media without giving her a proper opportunity to respond to his questions."

- o "O'Toole alleges that after the conclusion of the March 31 status conference, Judge Schroeder held an "extrajudicial hearing" concerning an incident that occurred between the family of the victim and Assistant Prosecuting Attorney Christopher Fortunato. According to O'Toole, after the

22

status conference was completed, Judge Schroeder sua sponte recalled the case and improperly heard testimony from witnesses in the gallery. O'Toole claims the improper "extrajudicial hearing" resulted in her "being called a narcissist on the record" by a member of the victim's family. O'Toole further states that the judge failed to call Fortunato to testify and therefore heard only one side of the story. She believes that Judge Schroeder should have addressed the incident in his chambers and his failure to do so resulted in additional negative media attention about the prosecutor's office. O'Toole argues that the "extrajudicial conduct has severely prejudiced the [s]tate, and likely tainted any possible jury pool.""

o In response to these allegations, the trial judge unequivocally told the Supreme Court of Ohio that the state's prosecutor— charged with the capital re-prosecution of Mr. Akbar—was **lying**. *In re Disqualification of Schroeder*, 2023-Ohio-3171 (Judge Schroeder "claims that O'Toole has made "baseless dishonest statements calculated to mislead" the chief justice.")[14]

o The expulsion incident in the courtroom referenced in the Supreme Court of Ohio's opinion denying disqualification

---

[14] This is not the first time the Ohio Supreme Court has dealt with an allegation of dishonesty against Colleen O'Toole. *See In re Judicial Campaign Complaint Against O'Toole*, 141 Ohio St.3d 355, 2014-Ohio-4046 (upholding monetary penalties against O'Toole for knowingly making a false statement).

occurred between an assistant state prosecutor and Louis Waldman, a Canadian police officer who married deceased Officer William Glover's widow Marianne Glover-Waldman shortly after Mr. Akbar's trial. *See* CCP Tr. 3/31/23*; See also Disorder in the Court*, Star Beacon (4/5/2023), attached as Exhibit A (describing the profanity-laced and near-physical confrontation between the two men).[15]

o The day before Prosecutor O'Toole filed her second affidavit of judicial disqualification, the Republican Party of Ashtabula County unanimously passed a resolution calling for her resignation, citing the "ongoing re-sentencing of Odraye Jones" and invoking the incident with the Waldmans in court. The resolution also accused O'Toole of calling Ashtabula County

---

[15] Prosecutor O'Toole asserts that Mr. Waldman is not a "victim" in this case. Without taking a position on the matter, undersigned counsel flags for this Court that Louis and Marianne Waldman co-maintain a public Facebook page entitled "Execute Odraye Jones" that posts racist content about Mr. Akbar. *See* Exhibit B (sampling of screen shots of page administrator posts referring to Mr. Akbar as a "monkey," a "chimp," a "cockroach," "vermin rat fuck" and a "wish" to "avenge a white officers[sic] death by a black man" by "lynch[ing] your simian ass myself."). *See also* Exhibit C (Declaration of Randall Olsen confirming that as of the exact date of this filing, the "Execute Odraye Jones" Facebook page, first created in 2014, is no longer viewable.)

Sheriff Niemi "fraudulent and corrupt" and accused her staff of repeated unprofessional misconduct in court. *See* "Republican Party calls for O'Toole's resignation," *Star Beacon*, 5/6/23.

*Prejudicial Pre-trial Publicity*

o Critically, the state prosecutor **did** violate the gag order previously issued by Judge Sezon on December 2, 2022. In fact, the prosecutor violated it multiple times. *See In re Disqualification of Schroeder*, 2023-Ohio-3171 (Judge Schroeder asserting that he "merely [had to] read the newspaper" to discover published articles that included "direct quotes from O'Toole about the death penalty case"); Tr. 2/24/23 at 4 (appointed defense counsel arguing that prosecutor had been talking to the media and referencing Star Beacon articles from January 4th, January 25th and February 15th); *See also* Tr. 3/13/23 (Judge Schroeder referencing articles by dates).

o In addition to soliciting information from the state prosecutor despite the media gag order, the *Star Beacon*, the city of

Ashtabula's only local newspaper,[16] continues to open each of the dozen articles it has published by assigning Mr. Akbar the prefix "convicted cop killer." The paper has also published multiple color photographs of Mr. Akbar showing him in chains and a bright orange prison jumpsuit. *See*, e.g. "Convicted cop killer ruled competent to stand trial" *Star Beacon* 9/13/23. *See also* 9/26/23 Judgment Entry (trial court order granting Star Beacon right to photograph and take notes during the *Faretta* hearing knowing that Mr. Akbar would be in chains and prison clothing.)

o This is the same *Star Beacon* newspaper that published racist content, including an op-ed calling for the "construction of a

---

[16] Ashtabula County is home to approximately 75,000 people over the age of 18. Ashtabula City has a population of just under 18,000. Via telephone, the Star Beacon told an employee of the Federal Public Defender's Office that it currently maintains a print circulation of at least 5,100 newspapers per week. Its Facebook pages has 15,000+ followers.

gallows" at the town's center upon which to hang Mr. Akbar "by the neck until dead" before his 1998 capital trial.[17]

o The *Star Beacon* has also published multiple articles that include direct quotes from Officer Glover's widow Marianne Glover Waldman about the appropriate punishment at retrial. *See Star Beacon* 8/24/22 (Glover-Waldman: "it's not fair if he gets to live out his life in prison...He was convicted by a jury of his peers of his generation, but based on today's generation, he will not be sentenced to death. I know that and it hurts."; "Convicted cop killer, Odraye Jones, granted new sentencing hearing" *Star Beacon* 11/18/22 ("It's not fair. Odraye Jones destroyed my life and it's not fair if he gets to live out his life in prison.").

o The local media coverage has also emphasized the "security" needed to handle Mr. Akbar. *See Star Beacon* 1/27/23 (Mr. Akbar was "escorted by five sheriff's deputies); "Convicted cop killer

---

[17] Recirculation of current *Star Beacon* articles reveal that similar racist reader interactions persist. *See* Yahoo! News re-published article, "Convicted cop killer repeatedly disrupts court hearing" select comments, attached as Exhibit D (referring to Mr. Akbar as "this excuse for a humanoid"); ("A nice rope 25 years ago would have been far better"); ("Get a rope and find the nearest tree"); ("Use a ROPE!"); ("Thats[sic] the same attitude Tyre Nichols got beat for, its[sic] in their genes.")

repeatedly disrupts court hearing", *Star Beacon* 1/28/23 ("Two dozen police officers—18 from the Ashtabula Police Department—filled the courtroom for the hearing for security and in solidarity for their fallen officer.") *Star Beacon* 2/14/23 ("Several Ashtabula City police officers" filled the courtroom); *Star Beacon* 1/25/2023 ("Sherrif William Niemi would not say when Jones would be arriving in Jefferson, citing security reasons.")

o As recently as November 28, 2023, Cleveland's Channel 19 news ran a news story and related article featuring interviews with Officer Glover's widow Marianne Glover Waldman, who described in detail Officer Glover's gunshot wounds, and current Ashtabula City Police Chief Robert Stell who, flanked by two other uniformed officers, stated "We're obviously disappointed. We think that the death penalty was appropriate." The news reporter stated that Mr. Akbar's death sentence was overturned "because of some questionable testimony by a defense witness." *See* https://www.cleveland19.com/2023/11/28/widow-speaks-out-

after-death-sentence-overturned-ashtabula-cop-killer/ (last

accessed 11/30/2023).

*Continued Confinement at Supermax Prison*

o For reasons that do not appear anywhere in the state court

record, the Ashtabula County's Sheriff's Office has refused to

maintain custody of Mr. Akbar during the pretrial period,

contrary to an earlier order issued by Judge Schroeder.[18] *See*

---

[18] The current Ashtabula County Sheriff is William R. Niemi. The chief assisting prosecuting attorney at Mr. Akbar's 1998 capital trial was Ariana Taraghati, whose married last name was also Niemi. *See Disciplinary Counsel v. Sartini & Niemi, a.k.a. Tarighati*, 114 Ohio St.3d 205, 2007-Ohio-3601 (in unrelated case, imposing discipline for attorney misconduct against Mr. Akbar's capital trial prosecutors). It was Prosecutor Sartini, Ms. Niemi's boss and co-counsel, who first asked Dr. Eisenberg at Mr. Akbar's penalty phase whether Black men were Antisocial at thirty times the rate of the general population.

During federal habeas proceedings, four friends of Mr. Akbar (all Black men) proffered sworn statements that Sheriff's deputies blocked them from attending Mr. Akbar's capital trial. Some were told to leave the courthouse before ever reading the courtroom. *See* No. 1:03-cv-01192 Doc. 210-1 (declaration of Michael Loll); Doc. 210-2 (declaration of David C. Ballenger); Doc. 210-3 (declaration of Clarence Franklin) ("David and I were confronted by Ashtabula County Sheriff's deputies before we entered the courtroom. One of the deputies told me that no gang members were allowed in the courtroom."); Doc. 210-4 (declaration of Shontale N. Franklin) ("I was asked by the deputies what I was doing at the courthouse. When I told them I was there to attend Odraye's trial, the deputies told me to leave. I was not allowed to go to the courtroom.").

CCP 1/6/23 (Transport Order) ("The defendant shall remain in the Ashtabula Count[sic] Jail until the completion of his Re-sentencing trial or under further order of the Court.").

o As of the date of this filing, Mr. Akbar still is classified as a death sentenced prisoner on the Ohio DRC website. Since his transfer to the Ohio State Penitentiary for the purposes of his penalty phase retrial, his security level has been **increased** and his restrictions and conditions have worsened compared to his death row housing designation at the Chillicothe Correctional Institution. At OSP, Mr. Akbar is on constant lockdown in his cell aside from his recreational time. To date, Mr. Akbar still has not received all of his property, only a single laundry bag of legal materials he was allowed to bring with him in December. His boxes remain at Chillicothe Correctional Institution.

o Mr. Akbar has repeatedly asked the trial court why it has not ordered his transfer to the county jail where he is being subjected to punitive classification restrictions at the penitentiary over an hour away from the Ashtabula courthouse. *See* Tr. 11/1/23 at 38 (Mr. Akbar protesting that he should not be held in a supermax

prison during the pretrial period and trial judge responding: "I don't control that…And I'm not going to attempt to control that."); *see id.* at 37-48 (trial judge refusing to answer Mr. Akbar's question why he remains at OSP at all).

o Mr. Akbar is placed in a dry cell each time he is transported back to Ohio State Penitentiary because he refuses on religious grounds to submit to the prison's full body scanner. *See* Tr. 11/1/23 at 9. A dry cell is a solitary confinement cell without a plumbed toilet, designed to force the contents of an incarcerated person's digestive system into plain view so the prison can discover any potentially hidden contraband.

o Crucially, Mr. Akbar is not given any alternative to the body scanner, and the prison's mandatory scanning policy is in addition to a full strip search with a "cough and squat" element.

o A prisoner in a dry cell is denied clothes and shoes. They are issued a Ferguson safety (suicide prevention) blanket to wear. The dry cell is cold, the lights remain on for 24 hours a day and a live guard watches Mr. Akbar around the clock.

o Mr. Akbar goes on a hunger strike when he is forced to remain in a dry cell, which he explained to the trial court increases the stress of the experience and his recovery time. Tr. 11/1/23 at 9. Mr. Akbar has been informing the trial court of his dry cell experiences at OSP for over ten months. *See* 1/27/23 Tr. at 61.

*Prison Conditions Hampering Self-Representation*[19]

o Mr. Akbar has made frequent and consistent objections in the trial court that his prison conditions and continued confinement at the "supermax" Ohio State Penitentiary is interfering with his constitutional right to self-representation and his ability to obtain a fair trial. *See, e.g.,* 9/29/23 Tr. at 81 (appointed defense counsel stating that Mr. Akbar's case file is on a flash drive and Mr. Akbar will not be able to access it at the prison); 10/6/23 Tr. at 5 (Mr. Akbar is housed "on lock-down status" and cannot print anything at the prison); *id.* (counsel could not even get the *Faretta* ruling and counsel waiver form to Mr. Akbar prior to the status hearing because

---

[19] Mr. Akbar has also relayed many of the prison condition details described in this Motion to undersigned counsel directly.

of the prison's inefficient mail delivery); *id.* at 46 (Mr. Akbar stating that it takes two weeks to get copies made); Tr. 11/1/23 at 9 (Mr. Akbar explaining to trial judge that every time he is returned to OSP he has to spend three days in a dry cell without his legal materials).

o Mr. Akbar is still without his personal property that he was told to box up when he was transported from Chillicothe Correctional Institution to the OSP in December 2022. He was forced to leave large amounts of his legal materials behind and could only bring two boxes total of property.

o Mr. Akbar can access caselaw on an electronic tablet, but he must re-type any legal research using an electric typewriter, that is without a useable memory and has been malfunctioning. The printed type often is faint, and Mr. Akbar has to trace over it with a pen. *See* Tr. 10/6/23 at 53 (prosecutor O'Toole noting the delay that would occur if Mr. Akbar was required to re-type his previously filed, handwritten motions.)

33

o In order to file any pleadings, then, Mr. Akbar must do all of the above and then wait for a prison paralegal to make and return his required copies, which the court is requiring Mr. Akbar to hand-sign. The paralegal is often slow. Mr. Akbar recently waited over three weeks for copies of a single motion. He then has to sign each copy and mail them to the Ashtabula Public Defender's Office for filing. *See also* Tr. 10/6/23 at 48 (Mr. Akbar describing these issues for the trial court); *id.* at 43-44 (appointed counsel explaining for the court the inefficient mail delivery at DRC including dog sniff delays).

*Refusals to Address Mr. Akbar by his Name*

o As of the date of this filing, the trial court still refuses to address Mr. Akbar by his legal name, which was changed by order of the Probate Court of Ross County Ohio to "Malik Allah-U-Akbar" on November 5, 2014. Many of Mr. Akbar's "outbursts" in court have

followed Judge Schroeder's insistence on calling him by his former name. [20]

o  The state prosecutor included the trial court's refusal to address Mr. Akbar by his legal name in her May 5, 2023, affidavit for disqualification and averred that it amounted to a violation of Mr. Akbar's constitutional rights and has demonstrated "bias and prejudice against his Muslim faith". *In re Disqualification of Schroeder*, 2023-Ohio-3171.

---

[20] Dr. Hart, the court-appointed competency evaluator, "follow[ing] the Court's direction" also refused to address Mr. Akbar by anything other than his former name. *See* CCP 9/8/23 Hearing Exhibit (Dr. Hart Report 2/18/23 at 1).

o Without acknowledging the irony, Judge Schroeder responded that the allegation was "disparag[ing]" and that he was "merely following the practice of the federal court.[21] *Id.*

o Despite her allegation against Judge Schroeder, the record does not reflect that the state's prosecutor ever moved to amend the case caption or the indictment to reflect Mr. Akbar's legal name.

o As pointed out by the Supreme Court of Ohio, at the very first status conference, Judge Schroeder "stated that the defendant's counsel could file a motion regarding which name the court should use." *Id.* Setting aside a trial court's burdening of a capital defendant to defend the use of his legal name via written

---

[21] Undersigned counsel points out that the federal case dockets and captions reflect Mr. Akbar's current legal name. She can also attest that at both oral arguments, the Court of Appeals judges, who have never met Mr. Akbar and who will never preside over a jury trial concerning him, made good faith efforts to respectfully refer to him by his preferred and legal name. The "continuity and clarity" justification for federal courts' use of "Jones" in their opinions was a symptom of Mr. Akbar's habeas proceedings being initiated over a decade before his legal name change occurred. This rationale does not apply to a full remand for a brand-new penalty phase, especially where a putative capital jury will harmfully perceive that he is not in full control of his own defense. *See Hamilton v. Alabama*, 376 U.S. 650 (1964) (summary reversal of contempt order where African American court participant refused to answer until she respectfully was addressed with an honorific).

motion where his life is at stake aside, appointed counsel never filed such a motion. Nor did counsel file any formal motion after undersigned counsel again urged them to do so in early September 2023 given its clear significance to Mr. Akbar on both religious and racial grounds. *See* Tr. 9/29/23 at 47 (*Faretta* Hearing) ("Well, what I'm telling you is that as a matter of being a black man and a Muslim, you not just going to call me whatever you want to call me. Now, I will[sic] go through this in the prison. That's why I know it's only racists who refuse to respect my name.") *See Salaam v. Lockhart*, 905 F.2d 1168 (8th Cir. 1990) (prison's policy of using only committed names on prison records, clothes and mail was unreasonable restraint on First Amendment rights of inmate who changed his name after incarceration upon conversion to Muslim faith).

As these examples establish, this case presents exceptional circumstances that cast doubt on the ability of the State of Ohio to provide a penalty-phase retrial proceeding that protects Mr. Akbar's constitutional rights. Already, these proceedings are marred by reversible error, including the influence of the very same defense expert

the Sixth Circuit Court of Appeals held to have offered racist testimony in Mr. Akbar's first penalty phase proceeding. In addition, the state's own prosecutor has sworn in an affidavit that the proceedings already have been infused with "structural error" due to the *Faretta* delay and error under the First Amendment. That same prosecutor has repeatedly violated a gag order, contributing to the prejudicial pretrial publicity already flooding a small community; her subordinate nearly fist-fought a spectator in the courtroom. This Court can and should exercise its discretion to put an end to these tumultuous and flawed proceedings.

### C. The State of Ohio has made misleading representations to the state and federal courts.

In addition to the trial judge averring that the state's prosecutor lied in her affidavit to the Supreme Court of Ohio and the same prosecutor's specious denials to the trial court regarding her flagrant violations of the media gag order, the Warden has been less than forthright with the Sixth Circuit Court of Appeals since the initial mandate issued.

On April 7, 2023, the Warden filed "The Warden's Motion for a Determination that the State has Complied with the Conditional Writ, or in the alternative, that the Trial Court may Issue Necessary

Continuances." Doc. 333-1. Therein, the Warden cited to *D'Ambrosio v. Bagley:* "What vacates a conviction is an entry in the court docket, which—depending on the state's procedures—is likely made through a court order, or clear actions by the court signifying a vacatur." 656 F.3d 379, 388 (6th Cir. 2011). The Warden then argued that, in Mr. Akbar's case, "[t]he trial court's actions signify vacatur of the sentencing judgment, and the necessity of a new sentencing hearing free of constitutional error." *Id.* at 3.

Yet nowhere in its pleading did the Warden inform the Court of Appeals that the Ohio trial court expressly declined to vacate Mr. Akbar's sentencing judgment in a seven-page written opinion, after briefing and argument. *See* CCP 2/17/23 Judgment Entry (Opinion denying State's Motion to Vacate). Crucially, the trial court found that vacatur alone— without a constitutional resentencing conducted within 180 days—would **not** satisfy the conditional writ. *See id.* at 6-7. Surely a trial court's written refusal to order vacatur would trump anything that arguably could "signify" that vacatur had occurred under the "totality of the circumstances." *See D'Ambrosio*, 656 F.3d at 388.

That the Court of the Appeals correctly denied the Warden's motion does not diminish that the Warden omitted the most salient fact to an argument it was making to escape the oversight of the federal court in a capital case. *See* Doc. 335-2 at 4 (The Court of Appeals finding that "[Mr. Akbar]'s conviction remains intact, and there is no indication that the state court has vacated [Mr. Akbar]'s death sentence.") The Warden's omission was also fully knowing. Perhaps unbeknownst to the Warden, the state prosecutors revealed at a status conference that they filed the Motion to Vacate in the state court upon the recommendation of the Warden to attempt to divest the federal court of jurisdiction. Tr. 2/14/23 at 15 ("Ms. Cantalamessa: Your Honor, after conferring with the AG's Office and they recommended that according to this case, **Edelman**, which is quoted in our motion, that we move to vacate the sentencing entry, which would vacated the unconstitutional order that the Sixth Circuit found, and thereby it would take away their jurisdiction to order us to – that conditional writ that they put on for 180 days.") (double emphasis in original); *see also* Tr. 3/31/23 at 18 (appointed counsel telling the trial court that the Warden had emailed them "saying that if we were going to the Sixth Circuit [to seek an extension], the State would join in

the motion. So, I just wanted to clear that up and make certain that the Court understands that once the State of Ohio found out – whether it's the AG's Office or the Prosecutor's Office, once the State found out that if the defense was going to go to the Sixth Circuit, it wasn't going to oppose.") Yet, a week later, the Warden filed its Motion in the Court of Appeals, not to extend the time limit, but to release the State from the mandate altogether.

More recently, the Warden made another critical omission when it moved the Court of Appeals to extend the mandate period by an additional 248 days, lauding Mr. Akbar's newly granted *pro se* status as the reason for its request. Doc. 349-1. The Warden took care to highlight that the trial court had already "granted an extension of time to **May 20, 2024**, well beyond the date this Court set as a deadline for compliance with the writ." *Id.* at 4 (double emphasis in original). Yet the Warden again left out a critical fact that weakened its position: that the state's prosecutor—at the very same time—was opposing any extension in the trial court.

On October 20, 2023, the prosecutor filed a "Response to Court's Sua Sponte Order for Continuance," notifying the trial court "that it does

strenuously **object** to Defendant's supposed Oral Motion for Continuance AND/OR the Court's Sua Sponte Order for Continuance." (emphasis in original). Before the state court, the prosecutor was concerned not with Mr. Akbar's *pro se* status, but with "the State's ability to prosecute the Death Penalty" and was requesting relief contrary to what the Warden was representing to the Court of Appeals: "the State of Ohio requests that this case be placed on the docket for trial within the time frame as mandated by the Federal Court." *Id.*[22]

There is another strong record indication that the Warden's omissions were purposeful attempts to mask unhelpful developments in the state court. In a different pleading filed with the Court of Appeals—

---

[22] The prosecutor's motion was filed four days before the Warden's motion and was not the first indication of dissension between the two. *See, e.g.,* CCP 2/17/23 Judgment Entry at 4 (trial court noting inconsistencies between the prosecutor's repeated representations to the court and with the Attorney General's subsequent actions.) *Compare* Tr. 2/24/23 at 11-12 (state prosecutor representing to the trial court that it would send the defense motion for a continuance to the AG's office to attach to a motion to extend the mandate) *with* Tr. 3/13/23 at 3-4 (state prosecutor recalling any intention to ask for an extension of time based on "the recommendation of the AG."). *See also* Tr. 3/30/23 (Judge Schroeder outlining the "change in position" of the State regarding its intent to seek an extension of the mandate across four separate status conferences held between January 27th and March 13th); Doc. 335-2 at 2-3 (Court of Appeals noting same incongruencies in the State's position).

filed in between the two Motions discussed above—the Warden

disavowed that it represents the State of Ohio at all:

> It should also be noted that the Ashtabula County
> Prosecutor's Office is the entity conducting the new mitigation
> hearing for the State of Ohio. That is a different entity
> altogether than the Ohio Attorney General's Office who
> represents the Warden of the prison, not the State of Ohio,
> and is not involved in the state court action involving Jones.

Doc. 45 at 4 (Response to Motion to Reconsider).[23] To be clear, this

statement was made by the same Warden who defended Mr. Akbar's

unconstitutional state death sentence for nearly two decades in federal

court, who still denied the racism underlying it in its unsuccessful

---

[23] The trial court, too, recently denied answerability to the federal
court even though it has invoked the strictures of the mandate when
making multiple substantive rulings. *See* Tr. 11/1/23 at 46 (in response
to Mr. Akbar's questions about the upcoming expiration of the mandate
period, the trial court responding "Well, the mandate is not upon this
Court. The mandate is upon the State. The State can take whatever
appropriate relief they feel is necessary with respect to that mandate.");
*id.* at 45 (Mr. Akbar reminding the judge that: "You said it [the mandate]
was your – it was the concern of the Court all this time, when you-all
sought a continuance and you and him conspired to get this continuance
for eight months or whatever it was. Five months, six months. It was your
concern then."). *But see* Tr. 1/27/23 at 26 (Court: "we have a mandate that
this matter be scheduled within 180 days of the date that the mandate
was issued."); Tr. 9/8/23 at 14 (trial court telling appointed counsel that
there was "virtually no way" for the court to grant his request for an
African American evaluator and still comply with the trial date that was
set to adhere to the mandate).

petition for *en banc* review,[24] who currently is advising and even directing the state prosecutor to file pleadings in the state court, who is emailing appointed counsel (now standby counsel) concerning the mandate, and who is making incomplete representations regarding those proceedings to the Court of Appeals. While one can understand why the Warden might prefer to distance itself from any responsibility for the havoc occurring in Ashtabula County, its position that it does not represent the State should be rejected out of hand. *See D'Ambrosio v. Bagley*, 656 F.3d 379, 383 (6th Cir. 2011) ("The **state**, represented by the warden, now appeals this decision.")

### D.  In light of these extraordinary circumstances, this Court should exercise its discretion and bar the retrial.

"Habeas corpus is, at its core, an equitable remedy." *Schlup v. Delo,* 513 U.S. 298, 319 (1995). District courts are commanded to dispose of habeas actions "as law and justice require." 28 U.S.C. §2243. This power is broad and confers the power "to grant any form of relief necessary to satisfy the requirement of justice." *Levy v. Dillon,* 415 F.2d 1263, 1265

---

[24]*See Jones v. Bradshaw*, No. 07-3766, 2022 WL 10219982, at *1 (6th Cir. Oct. 7, 2022) ("No judge has requested a vote on the suggestion for rehearing en bane[sic].")

(10th Cir.1969). This power unquestionably includes the authority "to stop a state criminal proceeding" by barring prosecution where "exceptional circumstances" exist. *See D'Ambrosio*, 656 F.3d 379, *Jones v. Cain,* 600 F.3d 527, 542 (5th Cir. 2010); *see also Satterlee v. Wolfenbarger,* 453 F.3d 362, 370 (6th Cir. 2006); *Foster v. Lockhart,* 9 F.3d 722, 727 (8th Cir. 1993); *Capps v. Sullivan,* 13 F.3d 350, 352–53 (10th Cir. 1993).

In Mr. Akbar's case, the federal courts already have facilitated ample opportunities for the State to conduct a penalty phase retrial. Yet the State failed to comply with this mandate set and then more than doubled in time by the Court of Appeals. *See D'Ambrosio*, 656 F.3d at 385-86. Nor did the State exercise its option to abandon its pursuit of the death sentence. ("Here, the state clearly chose to conduct a new trial, even though it failed to do so, and there is no indication that the state at any point in time decided instead to exercise the setting-aside alternative.")

In addition to its non-compliance, the State—through its prosecutor and the Warden—has made material misrepresentations and/or omissions in both the state and federal courts and has attempted to evade

federal supervision of its actions. This gamesmanship, including the state court prosecutor's initiation of lengthy judicial disqualification proceedings against Ashtabula County's only remaining judge during the mandate period, "counsel[s] against a finding that the State engaged in a good-faith effort to substantially comply with this Court's mandate." *D'Ambrosio,* 656 F.3d at 382. *See also id.* at 383 (And, as the 180–day deadline approached, certain of the State's counsel baselessly attacked the state trial judge, came before this Court and supplied testimony that, charitably, only can be described as "strain[ing] credulity," and showed startling indifference to D'Ambrosio's rights.")

Most importantly, numerous constitutional errors already are percolating in Mr. Akbar's retrial proceedings, not least of which is the careless and flagrant importing of the unconstitutional race-based opinions of Dr. Eisenberg, has transformed this case into a situation where "the constitutional problem that led to the grant of the writ cannot be cured by a new trial." *See Woodfox v. Cain*, 805 F.3d 639, 646 (5th Cir. 2015); *Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir. 1993) ("[Barring retrial] is a power necessary to protect the purpose of habeas corpus

jurisdiction when the error forming the basis for the relief cannot be corrected in further proceedings.").

The State's still-broken train should not be allowed to leave the station, and Mr. Akbar should not have to wait another quarter-century for Ohio to acknowledge these already-cemented constitutional violations. *See Woodfox v. Cain*, 805 F.3d 639, 651 (5th Cir. 2015) (Dennis, J., dissenting from the refusal to bar retrial) (noting that it took an additional twenty years for the State to acknowledge unconstitutional racism in the selection of the grand jury during petitioner's retrial).

Yet another exceptional circumstance weighing in favor of barring retrial is that Mr. Akbar now has been imprisoned by the State of Ohio pursuant to an unconstitutional death sentence for over 26 years. Where parole after 25 years of imprisonment is an Ohio-sanctioned, possible sentence Mr. Akbar could receive at a constitutionally compliant retrial, and where he already has served more time than this mandatory minimum penalty, any continued delay could result in an irreparable loss of liberty. *See Morales v. Portuondo,* 165 F. Supp. 2d 601, 609 (S.D.N.Y. 2001) (the "troubling" handling of a case by the prosecutor's office and a petitioner's "extended and potentially unjustified perio[d] of

incarceration" both are considerations weighing against permitting a retrial). Should this Court appropriately bar Mr. Akbar's penalty phase retrial, he still would receive a statutorily valid sentence and would not be released subject to eventual review by the Parole Board. *See* Ohio R.C. § 2929.03 (West). *See also Lovins v. Parker,* 604 F. App'x 489, 491-92 (6th Cir. 2015) (recognizing sentence reduction was best-tailored remedy for habeas petitioner who suffered a constitutional injury but whose conviction remained valid); *Satterlee,* 453 F.3d 362, 370 (6th Cir. 2006) (citing *Lewandowski v. Makel,* 949 F.2d at 887, 889 (6th Cir. 1991) (ordering release when the defendant had already served a longer sentence than would have been possible under a favorable plea offer)).

The passage of time since Mr. Akbar's first trial also favors the barring of reprosecution as it will compromise the vitality of Mr. Akbar's defense. *See, e.g., Lopez v. Miller,* 915 F.Supp.2d 373, 434–35 (E.D.N.Y.2013) (considering the death and unavailability of witnesses at any retrial and the inability of petitioner to otherwise obtain "a fair retrial" as a factor weighing in favor of granting an unconditional writ barring reprosecution); *D'Ambrosio v. Bagley,* 688 F.Supp.2d 709, 729–30 (N.D.Ohio 2010) (same). *See* Tr. 9/28/23 at 9 (at the *Faretta* hearing,

48

Mr. Akbar stating his intent to establish a mitigating circumstance through eyewitness testimony from 1997). *See also* CCP 8/25/23 Motion for Funds (appointed counsel explaining the difficulties and cost associated with "locating and attempting to locate witnesses, documents and other pertinent materials" in a case that "is 25 years old").

Lastly, for nearly a year now, Mr. Akbar has faced increasingly harsh conditions at the supermax Ohio State Penitentiary, conditions to which he would not be subjected but for this retrial, and but for a trial judge who refuses to transfer him to an environment suitable for a not-yet-sentenced defendant exercising his right to self-representation. *See Schuster v. Vincent,* 524 F.2d 153, 159 (2d Cir.1975) (conditions of petitioner's confinement is a factor supporting an unconditional writ of release).

For all the above reasons, this Court should, without delay, issue an unconditional writ of habeas corpus and order that the State of Ohio vacate Mr. Akbar's death sentence and further be barred from conducting a penalty phase retrial.

Respectfully submitted,

/s/ Kathryn Bailey
Assistant Federal Public Defender

/s/ Kirk J. Henderson
Assistant Federal Public Defender

Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222
(412) 644-6565
Kara_Bailey@fd.org

Counsel for Mr. Akbar

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2023, a copy of the forgoing Motion to Direct the District Court to Issue an Unconditional Writ of Habeas Corpus was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt. Parties may access this filing through the Court's system.

<u>/s/ Kathryn Bailey</u>
Kathryn Bailey
Assistant Federal Public Defender
Capital Habeas Unit